[File No. 7245]

FRED REITMAN, Respondent, v. F. C. MILLER, Appellant and Joe Kreller, Respondent.

(54 NW2d 477)

Opinion filed July 29, 1952

*Hyland & Foster,* for defendant and appellant, F. C. Miller.
*Williams & Higgins,* for respondent.
*Robert Vogel,* for defendant and respondent, Joe Kreller.

SATHRE, J. The plaintiff Fred Reitman brought this action against the defendants F. C. Miller and Joe Kreller, jointly, to recover $1032.50 for combining 295 acres of crop on certain lands

owned by the defendant Miller and farmed by the defendant Kreller during the farming season of 1948. The complaint alleges that said land was farmed during said farming season by the defendant as tenant under a contract whereby the tenant and the owner were each to pay one half of the threshing or combining bill. The defendant Kreller admits the allegations of the complaint and offers to pay one half of the combining bill.

The defendant Miller answers separately denying the allegations of the Complaint, except that he admits that he owns the lands described in the Complaint. He alleges that as owner he was to furnish the seed and that Kreller was to furnish all labor and machinery, to pay all costs in connection with the farming operations, and to deliver the one half of the crop to the defendant Miller at the elevator without charge to Miller.

The case was tried to a jury which returned the following verdict for the plaintiff:

"We, the jury in the above entitled action find for the plaintiff and against the defendant F. C. Miller for the sum of $516.25 and against the defendant Joe Kreller for the sum of $516.25 damages and interest on both at 4% per annum from September 11, 1948."

The defendant Miller moved for a directed verdict in his favor at the close of the testimony and thereafter for judgment notwithstanding the verdict, or in the alternative for a new trial. The motion was denied by the trial court, and judgment was entered for the plaintiff in accordance with the verdict. The defendant Miller appeals from the judgment and from the order denying his motion.

The appellant assigns numerous specifications of error, but which may be considered under three heads:

Insufficiency of the evidence to support the verdict.

Error in the admission of evidence.

Erroneous instructions to the jury by the trial court. These specifications will be considered in the order stated.

We will first consider the question as to the sufficiency of the evidence to support the verdict.

It is clearly established by the evidence that at the request of the defendant Kreller the plaintiff combined 295 acres of grain,

at $3.50 per acre, and that the grain was owned in equal shares by Miller and Kreller. The rental agreement between Miller and Kreller was in writing, was introduced in evidence and is as follows:

"Underwood, N. D. Station                                    4–20–48
Renting Contract.

Joe Kreller First Party and Fred Miller Second Party for land NE¼–8; NW¼–9–149–82, Second Party to furnish seed and first party to crop and deliver to elevator and party to divide ½ crop to each party delivered at Elevator at Underwood, N. D. for 1948.

K. Tenneson                                    Fred Miller
Witness                                         Joseph. Kreller."

Miller contends that the written agreement is complete and unambiguous, that it clearly fixes the rights and obligations of the parties, and that by its express terms the only obligation of Miller was to furnish the land and the seed, and this he did; that Kreller was to farm the land and deliver the one half of the crop to Miller at the elevator at Underwood at Kreller's own expense.

Kreller contends that the agreement is ambiguous in that it is silent as to the expense of combining the grain and on this theory the trial court permitted him to testify to the following conversation had with Miller about a week before combining had started:

"I owned a small combine and I could only do straight combining but it was awful slow, and he wanted his grain combined as soon as possible. I did too. It was a good crop. I said I had a swather. I had a swather and a six foot combine, so it goes twice as fast as if I would do straight combining. And then he says—well, at that time we had had quite a wind storm and a lot of people lost a lot of grain—just blowed it away and they never even found it. So he said 'I don't believe that would be a good idea. We ought to straight combine'. I said that I would just as soon do it but with a six-foot combine, it would take a long time. He says 'We can hire somebody to combine and we can get it reasonable under a good crop like

that and it won't cost too much'. I mentioned I could get a combine—in fact I looked up two of them."

He was then asked: Q. "Are you sure that he used the word 'we'?" A. "Yes." Q. "You are certain of them?" A. "Yes."

Miller objected to the admission of this testimony upon the grounds that it was an attempt to vary the terms of a written contract in violation of the parol evidence rule.

It will be necessary to consider therefore whether the contract is ambiguous and subject to modification of parol evidence.

The obligations of the parties to the contract were clearly expressed by the language employed therein. Miller's obligation was to furnish the land and the seed. Kreller was to crop the land, and deliver the crop to the elevator and divide one half to each party. There is no ambiguity in the language of the written contract.

"The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve absurdity." Sec. 9–0702 NDRC 1943.

"When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible, subject, however, to the other provisions of this chapter." Sec. 9–0704 NDRC 1943.

"Where a written contract is complete in itself, is clear and unambiguous in its language, and contains mutual contractual covenants agreed upon, such parts cannot be changed by parol testimony, nor new terms added thereto, in the absence of clear showing of fraud, mistake or accident." Larson v. Wood, 75 ND 9, 25 NW2d 100.

We are satisfied that the written agreement between Miller and Kreller is a complete contract and that the trial court erred in admitting testimony which would vary its clearly expressed terms.

The defendant Kreller was permitted to introduce testimony as to custom and usage in the community relative to division of the expenses of threshing and combining between landlord and tenant, over the objection of Miller that it was an attempt to vary the terms of a written contract by parol evidence. With

reference to this testimony the trial court instructed the jury as follows:

"There is some evidence in the record as to the custom and usage. Evidence of usage is allowed not only to explain but also to add tacitly implied incidents to the contract in addition to those which are actually expressed and where a contract is not in itself a complete expression of the intention of the parties, valid and known usages, if not inconsistent with the express terms, are admissible to supply matters as to which the contract is silent. But where a contract is clear and complete, new terms cannot be added by usage."

This instruction was assigned as error on the ground that it was misleading and that there was no proof of any implied incidents to the expressed contract. Since the written agreement is complete in itself the testimony as to custom and usage was inadmissible. The instruction complained of was clearly erroneous. It left with the jury the inference that the written agreement was ambiguous and incomplete.

In 55 Am Jur under Usages and Customs, Section 29, page 289, the rule is stated thus:

"Generally speaking, proof of a usage or custom is justified only when there is ambiguity or uncertainty upon the face of a written contract, arising out of the terms used, and can be used only to the extent of clearing up obscurity. Evidence of custom or usage is inadmissible to add new stipulations to, or ingraft them upon an agreement upon its face complete, where the agreement, as it stands, is plain and unambiguous. A custom or usage ordinarily cannot be proved to add something not within the reasonable meaning of the language of the contract or to supplement an apparently complete contract."

Under the title Parol Evidence as applied to farm leases, the following annotations are found in 151 ALR page 284:

"In the case of farm leases, it may be said that the courts are averse to permitting the use of parol evidence of custom or usage to vary the obligations of a written instrument which is complete and unambiguous. This conclusion was reached in the following cases decided since the preceding annotation on this

subject: May v. American Trust Co. (1933) 135 Cal App 385, 27 P2d 101; Huber v. Kerrick (1933) 251 Ky 439, 65 SW2d 449.

In the case of May v. American Trust Co., supra the court said:

"It is well-settled principle of law that custom or usage may be shown when the parties have not incorporated into an instrument all of the terms of their contract, and that evidence of usage is always admissible to supply a deficiency or as a means of interpretation where it does not alter or vary the terms of a contract. Usage, however, is only admissible as an aid to the interpretation of an ambiguous or uncertain contract; and it is never admissible to vary the terms of a clear and unambiguous contract."

In the case of Deacon v. Mattison, 11 ND 190, 91 NW 35 this Court said:

"Neither was it error to reject the offer of proof of custom above referred to. No evidence was introduced or offered to show and it is not alleged that the parties contracted in reference to any such custom. The plaintiff does not suc upon an obligation arising by virtue of a custom, but, on the contrary, bases his cause of action upon the express covenant contained in the written contract. Its language is in no sense ambiguous, and requires no reference to any custom or usage to ascertain the intention of the parties."

The appellant Miller also challenged the following instruction of the trial court as violating the parol evidence rule:

"The parties, Miller and Kreller, had a right to make an independent agreement with reference to combining the grain. If they did make such an agreement, and if Miller agreed to pay for part of the combining, then such agreement can be enforced."

Had the action been tried and submitted to the jury upon the sole issue whether Miller and his tenant Kreller subsequent to the written agreement had entered into an oral agreement to employ a third party to combine the grain, and complied therewith, the evidence would be admissible and sufficient to warrant the verdict.

Section 9-0906 NDRC 1943, provides:

"A contract in writing may be altered by a contract in writing or by an executed oral agreement and not otherwise. An oral agreement is executed within the meaning of this section whenever the party performing has incurred a detriment which he was not obligated by the original contract to incur."

The syllabus in the case of Quinlivan v. Dennstedt Land Co., 39 ND 606, 168 NW 51, states the rule as follows:

"While a written contract cannot be altered by a subsequent parol agreement, unless such agreement is executed, the contracting parties may nevertheless enter into a new parol agreement creating obligations separate from, and at variance with, the old ones, and such new agreement will be binding unless the agreement is one required by the statute to be in writing."

However, under the instructions of the trial court the case was submitted to the jury on two inconsistent theories,—one that the written agreement was ambiguous, and the other that the written contract was complete, but that the parties subsequently entered into an independent oral agreement which had been executed and which changed the terms of the written agreement. We are unable to determine from the record upon what theory the jury rendered its verdict.

The general rule is that error in instructions as to one theory of a case cannot be regarded as harmless, if it is impossible to determine upon which of two theories the jury based its verdict. Stewart v. Newbury, 220 NY 379, 115 NE 984, 2 ALR 519.

In the case of Atlantic Coast Line R. Co. v. Tiller, 142 Fed2d 718 the rule is stated thus:

"Furthermore, since the verdict was general, it is impossible to say whether it was based upon the issue that was properly submitted to the jury or upon the issue that should have been withdrawn. The rule to be applied in such a situation is stated in Stokes v. United States, 8 Cir, 264 F 18, 23 as follows:

'. . . A general verdict under an erroneous instruction cannot be upheld, when there were two theories submitted to the jury, on either of which they might have founded it, under one of which the instruction was harmless, while under the

other it was error, because the generality of the verdict renders it impossible to determine upon which theory the jury based it. They may have founded it upon the very issue to which the erroneous instruction related, and that instruction may have controlled and produced their finding. State of Maryland v. Baldwin, 112 US 490, 493, 5 S Ct 278, 28 L ed 822; Lyon Potter & Co. v. First Nat. Bank of Sioux City (8 Cir) 85 F 123, 129, 29 CCA 45, 48' ".

In the case of Tisdale v. Panhandle & S. F. R. Co. (Texas) 228 SW 133, 16 ALR 1264, this situation was before the Texas Civil Court of Appeals in which that court held:

"Plaintiffs in error contend that, even though the trial court had erroneously submitted to the jury the issue in question, such fact did not require a reversal of the judgment, because three issues of negligence were submitted, and there is nothing in the record to show that the verdict was not returned on one or both of the other issues. We think this contention is unsound. The judgment was based upon a general verdict. It was impossible for the court of civil appeals to know, or for the plaintiffs in error to show, that the verdict was not based upon the charge complained of and held by said court to have been erroneously submitted."

In the case of Hoeft v. State, 221 Ia 694, 266 NW 571, the Supreme Court of Iowa stated the rule in that state:

"It is the rule in this state that, where instructions are conflicting and inconsistent with each other, they are necessarily prejudicial. Morrison v. Railroad Co. 84 Iowa 663, 51 NW 75; Downing v. Insurance Co. 158 Iowa 1, 138 NW 917; Carlin v. Railroad Co. 31 Iowa 370; State v. Hartzell, 58 Iowa 520, 12 NW 557; Neville v. C. & N. W. 79 Iowa 232, 44 NW 367; State v. Schumacher, 195 Iowa 276, 191 NW 870; State v. Hillman, 203 Iowa 1008, 213 NW 603."

Under the instructions of the trial court the jury was permitted to consider evidence under the erroneous theory that the written contract was ambiguous, and also on the theory that subsequent to the written agreement the parties had entered into an oral independent agreement which had been executed. The jury ren-

dered a general verdict but we cannot determine upon which theory the verdict was rendered or whether it was rendered on both. For the reasons stated the judgment must be reversed and a new trial granted.

MORRIS, C. J., and BURKE, J., concur.

CHRISTIANSON, J. (dissenting). The defendants Kreller and Miller entered into an arrangement whereby Kreller agreed to crop certain land belonging to Miller in 1948. The parties entered into the following written agreement:

"Underwood, N. D. Station
Renting Contract                                               4–20–48

Joe Kreller First Party and Fred Miller Second Party for land NE¼–8; NW¼–9–149–82. Second Party to furnish seed and first party to crop and deliver to elevator and party to divide ½ crop to each party delivered at Elevator at Underwood, N. D. for 1948.

K. Tenneson                                     Fred Miller
Witness                                         Joseph Kreller"

The plaintiff Reitman was employed to combine the crops grown on the above land. A dispute arose between the defendants as to whether Kreller was obligated to pay all the cost of combining or whether the cost should be divided equally between the two parties so that in effect each of them would pay the expense of combining the flax and grain which upon division would belong to him. Kreller admits his liability for one-half of Reitman's charge for combining the crops and has offered to pay the same. Miller, however, denies any liability. Thereupon Reitman brought this action to recover for his services. It is the contention of Miller that the foregoing written memorandum is a complete and unambiguous contract which definitely and completely fixed all the rights and obligations of the parties and that under such contract Miller was obligated only to furnish the land and the seed and that the defendant Kreller was obligated to do and perform all work and defray all expense incident not only to the seeding and caring for the

crop until it ripened but also to defray all expense incident to harvesting and threshing or combining the crops and delivering the flax and grain so combined at the elevator.

The defendant Kreller on the other hand contends that the agreement was not complete and did not contain all the items of the agreement between the parties and in particular that the agreement did not contain any provision relating to the expense for the threshing or combining of the crops. He contends further that there was a well known and long established custom whereby it was understood between contracting parties to a lease or farm contract on a share basis that where the land owner furnished the seed and was to receive one-half of the crop that the cost and expense of threshing or combining the crop would be divided equally between the land owner and the tenant; and he contends that where nothing was said to the contrary between the parties that this well known and established custom was annexed to and became a part of the agreement between the parties and it was agreed between Kreller and Miller that each of the men would pay one-half of the expense for combining the crops.

The defendant Kreller and a witness Martin both of whom had lived in that locality for a long time and had been engaged in farming there testified that it was a well-known and established custom that where the contracting parties to a farm lease or farm contract on a share basis entered into an agreement that the land owner would furnish the land and the seed and was to receive one-half of the crop and nothing was said as to the cost and expense of combining the crop it was understood that the cost and expense of combining would be divided equally between the land owner and the tenant. The defendant Miller objected to this evidence on the ground that it was an attempt to contradict or vary a written contract by parol evidence. The trial court overruled the objections and admitted the evidence. Error is predicated upon the admission of such evidence and upon the court's instructions relating to such custom. The defendant did not deny the existence of such general custom or assert that he was not aware of it but he testified that since 1948 he had leased some lands to his son and his grandson and that in such transactions he furnished the land and the seed

and received one-half of the crop without being required to pay any part of the combining or threshing expenses.

Where a written instrument does not express the entire agreement parol evidence consistent with the writing is admissible to prove the part resting in parol, provided the agreement is not within the statute of frauds. 32 CJS, Evidence, Sec 1013, p 1027; 9 Encyl Evidence, 413–414.

In Corpus Juris Secundum it is said:

"Where a written instrument, executed pursuant to a prior verbal agreement or negotiation, does not express the entire agreement or understanding of the parties, the parol evidence rule does not prevent the introduction of extrinsic evidence with reference to matters not provided for in the writing. Under such circumstances it is not necessary that there should be any allegations of fraud, accident, or mistake in order to render parol evidence as to the real contract between the parties admissible." 32 CJS, Evidence, pp 1028–1029.

"The rule admitting parol or extrinsic evidence in the case of writings not expressing the entire agreement has been applied in connection with many instruments, including bills and notes, contracts, deeds, insurance policies, leases, letters, and mortgages." 32 CJS, Evidence, p 1032.

"Parol testimony introduced to supplement an incomplete writing may relate to matters of amount, time, place, mode, value, duties, risks, and other subjects." 32 CJS, Evidence, p 1035.

In Putnam v. Prouty, 24 ND 517, 140 NW 93, a written contract was made whereby the plaintiff turned over to the defendant certain farming lands, stock, and machinery under an arrangement by which the defendant was to farm the land and feed and care for the stock at his own expense for a certain term of years for a prescribed portion of the crops and of the stock and the increase thereof. The written contract also provided that the plaintiff agreed to sell to the defendant certain livestock and machinery for a designated sum, and contained the terms of payment, etc. It was held that a parol agreement could be shown by which the plaintiff, at the time the written contract was made,

agreed to furnish certain buildings for housing the stock. In the opinion in the case the court said:

"Mr. Stephens in his work on Evidence, chapter 12, sec. 2, states the rule as follows: There may be proved by parol 'the existence of any separate oral agreement as to any matter on which a document is silent, and which is not inconsistent with its terms, if from the circumstances of the case the court infers that the parties did not intend the document to be a complete and final statement of the whole of the transaction between them.' . . . We think the evidence of the parol promise of plaintiff to furnish a suitable building or buildings for housing said stock was admissible, as such evidence in no manner tended to change, contradict, or vary the terms of the written contract, as the subject-matter of such parol agreement or stipulation is not and was not intended by the parties to be covered by the stipulation declaring that defendant should feed and care for such stock at his own expense. See also 17 Cyc 720, wherein it is said: 'The existence of a written lease does not preclude parol evidence of a collateral agreement between the lessor and the lessee, unless it is inconsistent with or contradictory to the terms of the written instrument. Thus it may be shown that there was an independent agreement of the lessor to make certain repairs or to provide certain fixtures, a warranty as to the condition of the premises, or a contemporaneous promise of the landlord that the adjoining premises shall not be used in a manner inconsistent with the convenient use of the demised premises.'" Putnam v. Prouty, 24 ND at pp 526–527.

In Keck v. Kavanaugh, 45 ND 81, 177 NW 99, this court had occasion to deal with a situation where a written contract was made between the landowner and an architect for the preparation and furnishing by the latter of plans and specifications for a theater, store and apartment building to be constructed on a site of specified dimensions. The contract specified in some detail the compensation and manner of payment of the architect and contained other particulars of the contract but failed to designate the cost of the building, its height, or the materials of which it was to be constructed, and it was held that parol evidence was admissible to show that it was the understanding

of the parties that the building should not cost more than a specified sum. The plaintiff contended that the rights and obligations of the parties were fixed by the written contract and that the evidence offered by the defendant was not admissible, that it tended to contradict and vary the terms of the written contract. The trial court ruled that the evidence was admissible. This court sustained the rulings of the trial court. In the opinion in the case this court said:

"It will be noted that the written agreement in this case is entirely silent upon the question of the cost of the building, as well as upon its height and the materials of which it is to be constructed. It would be strange indeed if there was no understanding whatever as to these matters. The contract might have reference to a two-story frame building to cost $15,000, or it might have reference to a ten-story brick building to cost $500,000 or more. It would be equally applicable in either case. The evidence as to the parol agreement with respect to the cost of the proposed building did not tend to contradict or vary the terms of the written contract. The parol agreement sought to be established by such evidence was entirely consistent with the terms of the writing."

The case of Beason v. Kurz, 66 Wis 448, 29 NW 230, involved a building contract which provided "the entire walls of the building, inside and outside are to be painted." Controversy arose as to whether this clause required that the plastered inside walls of the house as well as the woodwork be painted. The court held that parol evidence was admissible to show that it was not intended that the inside plaster walls should be painted. In the decision in the case the court said: "We are of the opinion that the language of the contract is not so plain, definite, and unmistakable as to shut out extrinsic evidence of the sense in which it was used by the parties in their contract."

In Cassidy et al. v. Fontham, 38 NYS 177, 14 NYS 151, the court had under consideration a contract whereby one M agreed to "furnish all materials and labor for plumbing" in certain houses. The court held that oral evidence was admissible to show that such agreement should not include the furnishing and setting up of kitchen ranges. In the opinion in the case the

court said: "The rule that excludes oral testimony to contradict or vary the terms of a written instrument is directed against evidence that would add other words to it, or substitute other words in its stead, but does not apply where there is any uncertainty as to the object or extent of the engagement of the parties, or where the meaning of the terms employed is technical, in which case the testimony of experts is admissible to explain it. 1 Greenl. Ev. sections 275–280. Verbal testimony must be resorted to to ascertain the nature of the subject to which the instrument refers. Id. 286. In the term 'subject' in this connection is included everything to which the instrument relates. Phil. & Amos, Ev. 732, note. Thus where certain premises were leased, including a yard described by metes and bounds, and the question was whether a cellar under the yard was or was not included in the lease, verbal evidence was held admissible to show that at the time of the lease the cellar was in the occupancy of another tenant, and therefore it could not have been intended that it should pass by the lease."

The principle under which parol evidence is admissible to show a collateral agreement which is not inconsistent with the terms of the written agreement, and on which the writing is silent, is applicable to a custom or usage.

"Evidence of usage may be permitted to add tacitly implied incidents to a contract and to supply matters as to which the contract is silent." 25 CJS, Sec 26, p 113.

"Though the principle under which incidents are annexed to written contracts by usage is the same as that which controls the admission of collateral parol agreements, usage may be more effective than an express agreement. The test in both cases is the practical one whether a reasonable contracting party might fairly be supposed to have entered into the written contract in question and have intended to be bound both by its express terms, and also by the terms of the usage or collateral parol agreement in question. Concrete cases seem to indicate that reasonable persons may with far greater probability rely on a recognized usage to affect the otherwise natural implications of their written contracts than on collateral parol agreements. By usage a tenant

has been held entitled to hold over part of leased premises after expiration of the notice to quit for which the lease provided. A signature 'as agent to merchants' which the court admitted would not have bound the agent personally, has been held to bind him under a usage which made an agent liable who failed to disclose his principal." 3 Williston on Contracts, p 1888.

In 9 Wigmore on Evidence, 3rd Ed., Sec. 2440, it is said:

"Where the parties have not intended to make the document embody the entire transaction upon a particular topic, its terms may be as well supplied by implied extrinsic agreement as by express extrinsic agreement. In other words, that *usage* or *custom of a trade* or *locality,* which would otherwise by implication form a part of the transaction, will equally form a part when the transaction has been embodied in a document, provided the document was not intended to cover the topic affected by the custom. The test is on principle the same as for express extrinsic agreements; except that in the case of the custom the ordinary presumption is in favor of its implication, because the topics covered by the writing will usually be those which do not concern some known and usual term but vary in each particular transaction:

"1836, Parke, B., in Hutton v. Warren, 1 M. & W. 466, 475: '(The inclusion of customs into written contracts) has been done upon the principle of presumption that in such transactions the parties did not mean to express in writing the whole of the contract by which they intended to be bound, but a contract with reference to those known usages.'

"1854, Coleridge, J., in Brown v. Byrne, 3 E. & B. 703: 'In all contracts, as to the subject-matter of which known usages prevail, parties are found to proceed with the tacit assumption of these usages; they commonly reduce into writing the special particulars of their agreement, but omit to specify these known usages, which are included however, as of course, by mutual understanding; evidence therefore of such incidents is receivable. The contract in truth is partly express and in writing, partly implied or understood and unwritten.' "

In Williston on Contracts (3 Williston, Revised Edition, pp 1884–1885) it is said:

"Usage has been given effect in the following cases, though the rule of law would, in many of the cases, have been otherwise, apart from usage: that a tenant should have the crop growing at the expiration of a fixed term; that a contract of employment by the year may be terminated by a month's notice; that the travelling expenses of a salesman who receives a 5 per cent. commission are to be deducted from the commission; that the seller will pay the freight on goods sold; that the obligation to pay freight is to be based on the measurement at the place of shipment; that the buyer will pay the sales tax on the goods; that the buyer will furnish boxes for the shipment of grapes, even though the sale was f.o.b.; that on the rejection of a shipment by the consignee the carrier should notify the consignor within forty-eight hours; that a contract to sell in terms performable at a fixed day is not to be regarded as broken until after the lapse of twenty-four hours' notice; that insurance premiums will be accepted by the insurer after the day of payment fixed in the policy, and that the insurance in the meantime is not invalidated; that a contract to perform for three years in a theater at a weekly salary does not require payment of salary during the theatrical vacation; that the owner of the building will furnish heat to protect cement floors being laid therein from frost; that a period of credit may be attached to a contract of sale which apart from usage would require payment on delivery; that in a sale on credit the delivery is to be concurrent with payment; that the buyer of goods shall be allowed a deduction of a certain percentage for wastage; and that the buyer of goods may consider an improper first shipment of goods as a repudiation of the entire contract. The manner or place of delivery, or the mode of payment may be shown in the same way. The time within which an offer must be accepted similarly may be shown to be twenty-four hours; and a time for the delivery of goods to be manufactured may by usage be shown to be reasonable, though apart from usage unreasonable." 3 Williston on Contracts, pp 1884–1885.

It is the rule at common law that if a lessee for a definite term sows a crop and it does not ripen or is not cut before the expiration of the term the landlord is entitled to the crop, in the absence of some agreement or usage and custom to the con-

trary or such acts on the part of the landlord as will operate as a waiver or estoppel. 15 Am Juris, Crops, 215. Crops which mature after the termination of the lease are known as away-going crops. In a celebrated leading case (Wigglesworth v. Dallison, 1 Doug. 201; S. C. 1 Smith Lead. Cas. pt. 2, p. 670) Lord Mansfield held that a custom that the tenant should have the away-going crop after the expiration of his term is good, if not repugnant to the lease. "Lord Mansfield said: 'It is just, for he who sows ought to reap, and it is for the benefit and encouragement of agriculture. It is indeed against the general rule of law concerning emblements, which are not allowed to tenants who know when their term is to cease, because it is held to be their fault or folly to have sown, when they knew their interest would expire before they could reap. But the custom of a particular place may rectify what otherwise would be imprudence or folly. The custom does not alter or contradict the agreement in the lease; it only adds a right which is consequential to the taking, as a heriot may be due by custom although not mentioned in the lease.' " The principle thus announced by Lord Mansfield has been recognized and applied by the courts of this country in many cases. Anno 11 LRA 801; Anno 9 Ann Cas 1140; Francis Bros. v. Schallberger, 137 Ore 529, 3 Pac2d 530, 83 ALR 108.

In Van Ness et ux. v. Pacard, 2 Peters (27 US) 137, 7 L ed 374, the Supreme Court of the United States had occasion to consider the question of the admissibility of parol evidence to establish usage and custom. The action was brought by the landlord against a former tenant for waste alleged to have been committed by him by pulling down and removing from the demised premises a dwelling house erected thereon by the tenant and attached to the freehold. The defendant offered evidence to prove "that a usage and custom existed in the city of Washington which authorized a tenant to remove any building which he might erect upon rented premises, provided he did it before the expiration of the term." The evidence was admitted over objection and the landlord assigned error upon the rulings of the court. In disposing of the contentions advanced the Supreme Court of the United States said:

"The second exception proceeds upon the ground that it was not competent to establish a usage and custom in the city of Washington for tenants to make such removals of buildings during their term. We can perceive no objection to such proof. Every demise between landlord and tenant, in respect to matters in which the parties are silent, may be fairly open to explanation by the general usage and custom of the country, or of the district where the land lies. Every person, under such circumstances, is supposed to be conusant of the custom, and to contract with a tacit reference to it. Cases of this sort are familiar in the books; as, for instance, to prove the right of a tenant to an away-going crop. 2 Starkie on Evidence, Part IV, p 453. In the very class of cases now before the court, the custom of the country has been admitted to decide the right of the tenant to remove fixtures. . . .

"The third exception turns upon the consideration whether the parol testimony was competent to establish such a usage and custom. Competent it certainly was, if by competent is meant that it was admissible to go to the jury. Whether it was such as ought to have satisfied their minds on the matter of fact was solely for their consideration; open, indeed, to such commentary and observation as the court might think proper in its discretion to lay before them for their aid and guidance. We cannot say that they were not at liberty, by the principles of law, to infer from the evidence the existence of the usage. The evidence might be somewhat loose and indeterminate, and so be urged with more or less effect upon their judgment; but in a legal sense it was within their own province to weigh it as proof or as usage."

In Kelsey v. Puckett, 198 Ia 839, 200 NW 421, the Supreme Court of Iowa had occasion to consider the matter of proof of a custom. The plaintiff in that case had been employed by the defendant to perform certain work in the repair and rebuilding of a set of farm buildings, and the plaintiff was to be paid at the rate of 75¢ per hour. The defendant admitted such agreement. The plaintiff pleaded that "there existed at the time the contract was made an established and well recognized custom in the vicinity of Rock Rapids and at the place where the labor was per-

formed that a contractor or supervisor of work of this character (should) receive a reasonable compensation for transporting and conveying the laborers from their homes to the place where the work was to be done, and that the person having the work done should pay for the time consumed in going to and from the job of work at the contract price per hour." It was also alleged that there existed a well recognized custom at the time the contract was made that in the performance of cement work the employer should pay the contractor the reasonable compensation for the use of his cement mixer. The trial court admitted the proposed evidence as to custom and submitted the matter to the jury. The Supreme Court held that the plaintiff was entitled to show that a custom of the alleged nature existed and that it prevailed at and prior to the time the contract was executed.

In 3 Williston on Contracts, Rev. Ed., pp. 1881–1883, it is said:

"In accordance with the principles heretofore considered, in connection with collateral parol agreements, it may be shown that a matter concerning which the written contract is silent, is affected by a usage with which both parties are chargeable. 'It has long been settled, that, in commercial transaction, extrinsic evidence of custom and usage is admissible to annex incidents to written contracts, in matters with respect to which they are silent. The same rule has also been applied to contracts in other transactions of life, in which known usages have been established and prevailed; and this has been done upon the principle of presumption that, in such transactions, the parties did not mean to express in writing the whole of the contract by which they intended to be bound, but a contract with reference to those known usages.' This necessarily involves the proposition that evidence of usage may be introduced to contradict implications of fact or law which in the absence of usage would have been drawn from the writing, since otherwise there would be no point in proving the usage. . . . Usage when not admitted merely for the purposes of defining the meaning of language is necessarily introduced for the purpose of adding a new element or term or incident, whichever one is pleased to call it, to the expressed terms of the contract. Sometimes almost every element

of a contract is left to be determined by usage. When an employee is engaged, or an agent or corporate officer is appointed, the nature of his duties and sometimes his compensation and term of service are not stated but are fixed by what is customary and reasonable."

In Jones Commentaries on Evidence it is said:

"The general rule excluding extrinsic evidence for the purpose of varying a writing has long been relaxed to permit evidence of custom and usage in explanation of dealings between landlord and tenant. In a well-known case Baron Parke explained that the courts look with favor upon evidence of usage and custom in this class of cases, for the reason that the common law has done little to prescribe the relative duties of landlord and tenant, and that justice requires proof of those usages which have grown up and become beneficial to the parties.

· "As to those matters concerning which a lease is silent, proof of general usage is competent for the persons are deemed to contract with reference thereto. Every demise between landlord and tenant, in respect to matters in which the parties are silent, may be fairly open to explanation by the general usage and custom of the country, or of the district where the land lies. Every person, under such circumstances, is supposed to be conusant of the custom, and to contract with tacit reference to it. A local custom may be ingrafted upon a farm lease, unless the written lease, in express terms, provides against a right claimed by custom." 4 Jones Commentaries on Evidence, 2d ed, Sec 1580, pp 2886–2887.

I do not believe that the written agreement can be said to be a definite and unambiguous agreement which provides that Kreller should pay all the costs and expense of combining the crops. The negotiation and the agreement between the parties concerned one general subject and yet there were several more or less separable features of the bargain. (9 Wigmore on Evidence, 3rd Ed, pp 97–99.) It is a matter of common knowledge that farm leases and farm contracts on a share basis ordinarily contain definite stipulations with respect to various incidents of the general subject matter and that among such stipulations or incidents is one relating to the cost and expense of threshing

or combining the grain and as to which of the parties shall bear such cost and expense or whether each of the parties shall bear a certain share thereof. The written agreement in question here is what has been termed of a "skeleton nature" and covers only certain specified elements of the bargain and standing by itself does not "import that all the stipulations between the parties with reference to the subject matter were intended to be expressed therein." (Gould v. Boston Excelsoir Co., 91 Me 214, 220, 39 Atl 554, 555–556.) The general usage and custom which the defendant Kreller claims existed and which the evidence offered by him tends to show did exist did not tend to contradict or vary the terms of the writing. The agreement does not purport to deal at all with the cost and expense of threshing or combining the crop and what is said in the writing does not either expressly or by implication exclude the application of such usage and custom to the transaction between the parties. The usage and custom sought to be established is in no manner repugnant or contrary to or inconsistent with the terms of the writing. Such usage and custom relate to an element to which no reference is made in the written agreement. (9 Wigmore on Evidence, 3rd ed, pp 97–99.) If there had been inserted in the agreement a stipulation that each of the parties should pay one-half of the cost and expense of combining the grain clearly such provision would not have been inconsistent with or repugnant or contrary to anything that was said in the writing; or if there had been inserted a stipulation in the writing that Miller should pay the whole of the cost and expense of combining the grain such stipulation would not have been inconsistent with or repugnant or contrary to what was said in the writing; and the same is true if there had been added a stipulation that Kreller should pay all such costs and expenses. So, likewise where there is a written agreement that the landowner shall furnish the seed and the cropper shall perform the work and defray the expense incident to the planting and caring for the crop, and the crop shall be divided equally between the parties, and the agreement is silent as to who shall defray the cost of combining the crop, parol evidence as to the existence of a general usage and custom that in such circumstances the cost

and expense of combining the crop shall be divided equally between the parties is not inconsistent with or repugnant and contrary to the written agreement.

Our statutes provide:

"When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible, *subject, however, to the other provisions of this chapter.*" (Italics supplied.) NDRC 1943, 9–0704.

"A contract may be explained by reference to the circumstances under which it was made and the matter to which it relates." NDRC 1943, 9–0712.

"However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract." NDRC 1943, 9–0713.

"All things that in law or usage are considered as incidental to a contract or as necessary to carry it into effect are implied therefrom, unless some of them are mentioned expressly therein. In such case, all other things of the same class are deemed to be excluded." NDRC 1943, 9–0721.

"Contracts to raise crops on shares have been said to assume various forms or to create various relationships between the contracting parties" and the relationship created in the particular case depends on the intention of the parties as evidenced by the terms of the contract, construed as a whole, and the subject matter and surrounding circumstances. 52 CJS, Sec 593, p 717, Sec 797, pp 719–720.

In American Jurisprudence it is said:

"Agreements between a landowner and another, by which the latter agrees to raise a crop upon the land of the former and by which both parties are to share in the crop so raised, may take the form of a mere contract of hiring or it may involve one of a variety of relationships between the parties. What is the exact relation in a particular case is frequently a difficult question of construction." 15 Am Jur, Sec 45, p 236.

"There is much confusion and not little conflict as to the construction of a contract between the owner of land and an occupier for its cultivation on shares and as to the rights of the parties in the land and in the crop. Much difficulty has been

experienced in determining the relationship created by the contract. While certain general rules applicable in the construction of contracts to farm on shares may be formulated, they are not, in the last analysis, definitely determinative of particular questions. The decision of a particular question of construction must depend upon the contract itself; slight provisions inserted in an agreement may very materially affect the legal rights of the parties." 15 Am Jur, Sec 47, p 238.

"Questions as to the particular relationship created by a contract to farm on shares are difficult to decide. As heretofore stated, much depends upon the terms of the specific contract involved. The general rule is that the question whether the relation of the parties is that of landlord and tenant, landowner and cropper, participants in a common venture, or some other relationship must turn upon the actual intention of the parties as gathered from the entire contract, the language in which it is cast, and the circumstances surrounding its execution." 15 Am Jur, Sec 48, pp 238–239.

The agreement does not state who is to furnish the land to be "cropped." The land is described as two quarter sections, amounting in all to 320 acres. The agreement does not state the acreage to be cropped. The evidence shows that Reitman combined 295 acres so apparently there were 25 acres that for some reason were not cropped. There is no contention that Kreller did not plant all the land that was intended to be planted so apparently it was not intended that the entire 320 acres should be cropped, and in order to ascertain the quantity of land that the parties had in mind it would be necessary to resort to extrinsic evidence. So, again, the agreement does not specify what kind of crops are to be planted and what kind of seed Miller shall furnish and Kreller shall plant, nor does it show whether the seed to be furnished is to be treated and if so, whether the seed is to be treated by Miller or by Kreller. Was the land to be seeded to wheat, oats, barley, spring rye, flax or some other kind of crop or was part of it to be seeded to one and other parts to other varieties of grain? On this matter the agreement is wholly silent. In the very nature of things there

must have been some understanding between the parties as to the kind of seed to be furnished and to be seeded or some understanding as to which one of the parties should designate the kind of seed to be furnished and the crops to be grown. The agreement provides that "Second Party to furnish seed and first party to crop and deliver to elevator and party to divide ½ crop to each party delivered at elevator." According to Webster's New International Dictionary the word "crop" when used as a verb relating to crops means "to cause to bear a crop; as to *crop* a field." The Century Dictionary defines the word "crop" when employed as a verb relating to crops to mean "to cause to bear a crop; plant or fill with crops; raise crops on; as, to *crop* a field. Funk & Wagnall's New Standard Dictionary of the English Language defines the word "crop" when so employed to mean "to plant for the purpose of obtaining a harvest; sow; as, *crop* that field with barley." I have been unable to find any other definition of the word "crop" when employed as a verb relating to crops.

Certainly the word "crop," when employed as a verb in an agreement to raise crops on shares where one party is to furnish the seed to be planted on a certain tract of land and the other party is "to crop and deliver to elevator" and the agreement contains no reference to and makes no provision for the cost and expense of threshing or combining, does not have any settled meaning or any meaning at all to the effect that the party who is to "crop" the land is to pay the entire cost of the threshing or combining of the crop. The word "crop" as used in such agreement does not import an obligation on the part of the person who is to "crop" the land that such party is to bear the entire cost and expense of the threshing or combining of the crop. The verb "crop" would be equally applicable under an agreement to raise crops on shares where the landowner and the cropper were each to pay a share of the threshing or combining expense as under an agreement where all of such expenses are to be paid by either of the parties. The written agreement makes no reference whatsoever to the topic of the cost and expense of threshing or combining. This topic or element is not mentioned, covered

or dealt with at all in the writing. If there had been a parol agreement relating to and covering this topic or element of the bargain, evidence of such agreement would not have operated to vary or contradict any of the provisions in the writing and such evidence would not have been inadmissible under the parol evidence rule. 9 Wigmore on Evidence, 3rd Ed, Sec. 2430; Bjornstad v. Northern States Power Co. 195 Minn 439, 263 NW 289; Danielson v. Bank of Scandinavia, 201 Wis 392, 230 NW 83, 70 ALR 746.

As has been pointed out this same rule is applicable to the admissibility of parol evidence to establish a general usage or custom relating to a topic or element which is not excluded by the written agreement, and the written agreement here does not exclude the general usage or custom which Kreller sought to prove. The evidence offered relating to the general usage and custom was admissible and no error was committed in the admission of such evidence. Nor was any error committed in admitting the testimony of Kreller relating to the conversation had between Kreller and Miller about a week before the crop was combined which conversation is referred to in the majority opinion. In such conversation Miller disapproved of Kreller's plan to combine the crop with a six-foot combine and swather. Miller proposed that the crop should be combined with a larger combine and that it should be "straight combined" and not be combined by the use of the smaller combine and a swather. He said: "We can hire somebody to combine and we can get it reasonable under a good crop like that and it won't cost too much." Thereafter Kreller made the arrangement with Reitman to combine the grain. While Reitman was engaged in combining and after he had combined some 70 or 80 acres Miller brought to the farm a man engaged in combining in the locality. There was some discussion as to what should be done. The testimony is not clear as to whether Miller desired to have the man he brought also combine so that both outfits would be used at one time. The evidence does show, however, that the person that Miller brought stated that the plaintiff was doing a good job and there was no reason why he should attempt to do any combining and the result was that Reitman went ahead and finished the combining.

The testimony as to the conversation between Miller and Kreller and the activities of Miller indicate that Miller recognized that both he and Kreller should pay part of the compensation to be paid to the person hired to combine the crop. This testimony did not contradict or vary the written agreement. This testimony referred to an incident or element which was not mentioned in the writing and was relevant as to the general usage or custom which was not excluded by anything that is said in the writing.

In the majority opinion reference is made to an instruction relating to the admissibility of evidence relating to usage and custom and it is said that "since the written agreement is complete in itself the testimony as to custom and usage was inadmissible," and the instruction clearly erroneous. Reference is also made to an instruction relating to the right of the parties to alter the written agreement by an executed oral agreement and it is said that if the action had been "tried and submitted to the jury upon the sole issue whether Miller and his tenant Kreller subsequent to the written agreement had entered into an oral agreement to employ a third party to combine the grain and complied therewith the evidence (relating to the oral agreement) would be admissible and sufficient to warrant the verdict." What is said with respect to these instructions is predicated upon the proposition that the written agreement was complete and covered all topics and elements of the bargain between the parties including who should pay the cost and expense of combining the grain and that the written agreement excluded the general usage and custom which the evidence adduced by Kreller tended to show existed and that evidence as to such usage and custom was inadmissible as tending to vary and contradict the terms of the writing.

As shown above I disagree wholly with the premise on which the conclusion of the majority is founded. In my view the written agreement was not complete and certain and did not purport to cover all the topics or elements of the bargain between the parties; and for reasons which I have set forth above Kreller was not precluded from showing the existence of the general usage and custom which he sought to show, and the evidence which was introduced with respect thereto was ample to justify

the submission of the question to the jury. If this were so, then, of course, it would be proper to submit to the jury both the question of the existence of the usage and custom and the question whether subsequent to the making of the written agreement they entered into an independent oral agreement relating to the combining of the grain.

I would affirm the judgment and the order denying defendant Miller's motion for judgment notwithstanding the verdict or for a new trial. I am authorized to say that Judge Grimson concurs in the views expressed in this opinion.

GRIMSON, J., concurs.