**Roy TONG, Plaintiff and Appellee,**

v.

**Adelaide BORSTAD, Individually and as administratrix of the Estate of Clayton Vedvick, Deceased, and as agent for Tillie Vedvick, et al., Defendant and Appellant.**

Civ. No. 9092.

Supreme Court of North Dakota.

June 25, 1975.

McIntee & Whisenand, Williston, for plaintiff and appellee; argued by Frederick E. Whisenand, Jr., Williston.

Waldron, Kenner & Halvorson, Minot, for defendant and appellant; argued by Michael G. Sturdevant, Minot.

VOGEL, Justice.

This is an appeal from a judgment for the plaintiff rendered in the district court of Williams County. It involves the role of custom in making law.

In the spring of 1957, Tong entered into a crop-share rental agreement for the farming of 560 acres of farmland in Williams County, North Dakota. This property was owned in part by Clayton Vedvick, now deceased, with the remaining 400 acres held in fractional interests by Adelaide Borstad and others for whom she acted as agent. Clayton Vedvick handled the business arrangements with Tong.

The parties originally entered into a half-and-half crop-share agreement with shared expenses. A copy of this written agreement could not be produced at trial. This was subsequently orally renegotiated into a one-fourth/three-fourths crop-share division, with Tong to assume all expenses except for one-fourth of any fertilizer costs. This oral agreement continued in effect until the tenancy was terminated after the 1972 growing season, when the land was sold.

When Tong assumed possession in 1957, approximately 230 acres had not been cropped in 1956 and was intended to be summer fallow. When the tenancy was terminated in 1972, Tong left 258.3 acres of summer fallow.

After the land was sold, Tong brought this action to recover the reasonable value of the summer fallow he left on the premises.

Trial to the court, sitting without a jury, resulted in a judgment for Tong in the amount of $1,289.70, together with interest at the rate of 4 percent per annum.

The appellant has presented two issues for consideration:

"I. Is a landlord obligated to compensate a tenant for improvements voluntarily made by the tenant upon the demised premises?

"II. Did the trial court err in finding that there were only the equivalent of 115 acres of summer fallow at the commencement of the tenancy?"

There is no evidence as to any specific agreement that summer fallow would be left on the land at the termination of the tenancy, nor that any shortage would be paid for by the tenant, nor that any excess would be paid for by the landlord or subsequent tenant. Such evidence perhaps was foreclosed by the terms of the Dead Man's Statute [N.D.C.C. § 31–01–03].

The plaintiff relied upon a custom of farmers in the area that (1) a tenant is bound to leave at the end of his tenancy as many acres of summer fallow as he received at the beginning, (2) if he leaves less, he must pay for the shortage, and (3) if he leaves more, he is to be compensated for the excess.

The defendant appears to agree that there is a custom as to (1) and (2), but denies that the custom extends to (3).

■ "A custom or usage which is merely local must be proved as any other fact." *First Nat. Bank of Fargo v. Minneapolis & N. Elevator Co.*, 11 N.D. 280, 285, 91 N.W. 436, 438 (1902). Whether a custom or usage exists, then, is a question of fact. Findings of fact made by a trial court sitting without a jury will not be set aside unless clearly erroneous. Rule 52, N.D.R.Civ.P.

The trial court made the following findings, *inter alia*:

## "XIII

"That since the 230 acres of cultivated land which was supposed to have been in summer fallow at the time that the plaintiff assumed possession of the premises described above was only one-half summer fallowed, and consequently the plaintiff was only required to leave on the premises at the expiration of his leasehold the equivalent of 115 acres of good clean summer fallow.

## "XIV

"That the plaintiff did leave 258.3 acres of good clean summer fallow on the premises described above at the expiration of said rental agreements and is entitled to be compensated for the reasonable value of said excess summer fallow acreage at the rate of $9.00 per acre."

Implicit in these findings is a finding that it was customary for a tenant taking over land to farm, unless he paid for the summer fallow existing at the commencement of the tenancy, to return a like number of acres of summer fallow at the termination of his tenancy as existed at the commencement of his tenancy, and that if there was a difference in the number of acres of summer fallow existing at the commencement of the tenancy and at the termination of the tenancy, the party entitled to it would be compensated for the difference.

■ There was ample testimony from witnesses, farmers in the vicinity, that there was such a custom in the vicinity. Such finding therefore was not clearly erroneous and will not be set aside.

A question then arises as to what role or effect custom or usage has in the interpretation of contracts or, more particularly, what effect the previously described custom has on this controversy.

Some law still is made by custom, as this case illustrates. Custom always has made law. The common law, "the law and custom of the realm," was drawn largely from custom.[1] Much of the modern law of negotiable instruments was adopted from the customs of merchants in international trade.[2] One commentator, James C. Carter,[3] asserts that law is nothing but custom, recognized by legislature or court, while others deprecate the importance of law created by custom.[4] But all agree that custom can make law, particularly in cases where "custom is so universal that the courts frame a rule of Law that certain agreements shall be presumed to have been made in accordance with it; and, as different forms of business arise, . . . customs will, as rules for determining the

**1.** Plucknett, *A Concise History of the Common Law*, p. 264.

**2.** *Idem*, Part III, ch. III.

**3.** Carter, *Law, Its Origin, Growth and Function*, pp. 71ff, 121ff.

**4.** Gray, *The Nature and Sources of the Law*, ch. XII; Austin, *The Province of Jurisprudence Determined*, pp. 30–32, 163.

meaning of agreements, be taken up into the Law."[5]

Although a Code State, in which the common law is applied only in the absence of statutory authority,[6] North Dakota recognizes the role of custom and usage in making law. "Usage" is defined in Section 1–01–31, N.D.C.C., which originated in the Dakota Territory Civil Code of 1877 as Section 2119:

"Usage is a reasonable and lawful public custom concerning transactions of the same nature as those which are to be affected thereby, existing at the place where the obligation is to be performed, and either known to the parties or so well established, general, and uniform that they must be presumed to have acted with reference thereto."

This is such a case.

Benjamin N. Cardozo, in *The Nature of the Judicial Process* (1921), at pages 58–64, discussing the rule of "custom" in judicial decision-making, tells us:

"If history and philosophy do not serve to fix the direction of a principle, custom may step in. . . .

\*    \*    \*    \*    \*    \*

"It is, however, not so much in the making of new rules as in the application of old ones that the creative energy of custom most often manifests itself today. General standards of right and duty are established. Custom must determine whether there has been adherence or departure. . . . The master in the discharge of his duty to protect the servant against harm must exercise the degree of care that is commonly exercised in like circumstance by men of ordinary prudence. The triers of the facts in determining whether that standard has been attained, must consult the habits of life, the everyday beliefs and practices, of the men and women about them. Innumera-

ble, also, are the cases where the course of dealing to be followed is defined by the customs, or, more properly speaking, the usages, of a particular trade or market or profession. . . . Life casts the moulds of conduct, which will some day become fixed as law. Law preserves the moulds, which have taken form and shape from life."

In *Wigglesworth v. Dallison*, 1 Dougl. 201 (K.B.1779), the plaintiff pleaded a custom:

" 'That, within the parish of Hibaldstow, there now is, and from time whereof the memory of man is not to the contrary, there hath been a certain ancient and laudable custom, there used and approved of, that is to say, that every tenant and farmer of any lands within the same parish, for any term of years which hath expired on the first day of May in any year, hath been used and accustomed, and of right ought to have, take, and enjoy, to his own use, and to reap, cut, and carry away, when ripe and fit to be reaped and taken away, his way-going crop, that is to say, all the corn growing upon the said lands which hath before the expiration of such term been sown by such tenant, upon any part of such lands, not exceeding a reasonable quantity thereof in proportion to the residue of such lands, according to the course and usage of husbandry in the same parish, and which hath been left standing and growing upon such lands at the expiration of such term of years.' "

In entering judgment for the plaintiff, Lord Mansfield held:

"We have thought of this case, and we are all of opinion, that the custom is good. It is just, for he who sows, ought to reap, and it is for the benefit and encouragement of agriculture. It is, indeed, against the general law concerning emblements, which are not allowed to tenants who know when their term is to

---

5. Gray, *op. cit.*, § 631.

6. N.D.C.C. § 1–01–06; *In re Estate of Jensen*, 162 N.W.2d 861 (N.D.1968); *Nuelle v. Wells*, 154 N.W.2d 364 (N.D.1967).

cease, because it is held to be their fault or folly to have sown, when they knew their interest would expire before they could reap. But the custom of a particular place may rectify what otherwise would be imprudence or folly. The lease being by deed does not vary the case. The custom does not alter or contradict the agreement in the lease; it only superadds a right which is consequential to the taking, as a heriot may be due by custom, although not mentioned in the grant or lease."

■ The cases are legion in which it has been held that evidence of custom and usage is admissible to ascertain the intention of the parties to contracts and to aid in the interpretation of contracts. See, generally, Corbin on Contracts, §§ 556–557; Williston on Contracts, 3d Ed., §§ 648–662; 21 Am. Jur.2d, *Customs and Usages*, §§ 1–2, 21–29; 25 C.J.S. *Customs and Usages* § 23.

Where customs or usages on a subject are prevalent, they are impliedly incorporated into agreements to measure the rights of the parties:

"It is well settled that parties who contract on a subject matter concerning which known usages prevail, incorporate such usages by implication into their agreements, if nothing is said to the contrary. Robinson v. United States, 13 Wall, 363, 366 [80 U.S. 363, 20 L.Ed. 653]." *Hostetter v. Park*, 137 U.S. 30, 40 11 S.Ct. 1, 4, 34 L.Ed. 568, 572 (1890).

"A custom has the force of law, and furnishes a standard for the measurement of many of the rights and acts of men." *Chicago, M. & St. P. Ry. Co. v. Lindeman*, 143 F. 946, 949 (8th Cir. 1906).

■ In view of the foregoing, we hold that, although a written contract that is complete in itself cannot be altered by parol evidence as to custom or usage [*Reitman v. Miller*, 78 N.D. 1003, 54 N.W.2d 477 (1952)], where an agreement is silent or ambiguous on a point, and where there is a well-established custom concerning the subject, so

that the parties may be presumed to have acted with reference thereto, such custom will be given effect as a part of the agreement.

■ Under the circumstances of this case, therefore, Tong, having left more summer-fallow acreage on the premises at the termination of his tenancy than existed at the commencement of his tenancy, was entitled, in accordance with the custom prevailing in the area, to be compensated for the difference.

Appellant has relied on *Greeman v. Smith*, 138 N.W.2d 433 (N.D.1965), and the general rule of law as stated in the legal encyclopedias [32 Am.Jur., *Landlord and Tenant*, § 659; 51C C.J.S. *Landlord and Tenant* § 399], holding that, absent an agreement between the parties, a lessor is not obligated to compensate a lessee for improvements voluntarily made by the lessee. Appellant also has relied on *Freedline v. Cielensky*, 115 Ohio App. 138, 184 N.E.2d 433 (1961), and *Grand Central Market Corp. v. Jewish Children's Home*, 310 Mich. 421, 17 N.W.2d 237 (1945), for the proposition that a theory of unjust enrichment does not apply in a situation such as the instant case, and on *Lawler v. Stanford*, 26 Ala.App. 416, 161 So. 265 (1935), for the proposition that the rule of law implying an obligation to pay the reasonable value of knowingly accepted services of another is inapplicable in a case such as this. This case, however, is not governed by the general law concerning improvements, unjust enrichment, or obligation for knowingly accepted services, but by a custom concerning the subject matter of the agreement. The custom is such that the parties must be presumed to have acted with reference thereto; it is just, since he whose labor has produced an increment in value to real estate should reap some of the profit which his labor has produced; and it is for the benefit and encouragement of agriculture, since it promotes good husbandry.

Appellant next urges that the trial court erred in finding that there was only the

equivalent of 115 acres of summer fallow at the commencement of the tenancy. The trial court found (in Finding XIII previously quoted) that since the 230 acres which was supposed to have been in summer fallow at the time Tong assumed possession was only one-half summer-fallowed, Tong was required to return only the equivalent of 115 acres of good, clean summer fallow. In other words, the trial court found that there was only the equivalent of 115 acres of good, clean summer fallow on the premises at the commencement of the tenancy.

 A question as to how many acres of summer fallow existed at the commencement of a tenancy clearly is a question of fact to be determined by the trier of facts. As noted previously in this opinion, findings of fact made by a trial court sitting without a jury will not be set aside unless clearly erroneous. Rule 52, N.D.R.Civ.P.

 This court recently held, in *Anderson v. Miller's Fairway Foods*, 225 N.W.2d 579 (N.D.1975), quoting *In re Estate of Elmer*, 210 N.W.2d 815 (N.D.1973):

"A finding of fact is clearly erroneous only when, although there is some evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. The mere fact that the appellate court might have viewed the facts differently, if it had been the initial trier of the case, does not entitle the appellate court to reverse the lower court." Syllabus ¶ 2.

 There was much testimony that the 230 acres which had not been cropped in 1956 and was intended to be summer fallow was very weedy when Tong assumed possession in 1957. There was testimony that the land was "awful weedy," "very weedy," "covered with weeds," and that the weeds were "two or three feet high." The trial court found that the land was "unduly weedy." In view of the testimony on this matter, we cannot say that this court is left with a definite and firm conviction that a

mistake was made in the trial court's finding that there was only the equivalent of 115 acres of summer fallow at the commencement of the tenancy. The finding was only a practical recognition that not all summer fallow is alike. There is good summer fallow and poor summer fallow. Practically speaking, a certain number of acres of poor summer fallow may be the equivalent of only a lesser number of acres of good summer fallow. The appellant does not dispute the finding that the summer fallow left on the premises by Tong at the termination of the tenancy was good and clean summer fallow.

Since the finding of fact as to the number of acres of summer fallow existing at the commencement of the tenancy and required to be left at the termination of the tenancy is not clearly erroneous, it will not be set aside.

Affirmed.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.