URBANA FARMERS UNION ELEVA-
TOR CO., a corporation, Plaintiff
and Appellant,

v.

John SCHOCK, Defendant and Appellee.

Civ. No. 10539.

Supreme Court of North Dakota.

May 31, 1984.

Pringle & Herigstad, Minot, for plaintiff and appellant; argued by Herbert L. Meschke.

Jonathan T. Garaas, Fargo, for defendant and appellee.

GIERKE, Justice.

The plaintiff, Urbana Farmers Union Elevator Co. [the Elevator], appeals from a judgment entered in the District Court of Stutsman County.

On March 31, 1980, the defendant, John Schock [Schock], a Stutsman County farmer and rancher, contracted with the Elevator to deliver 10,000 bushels of durum wheat. The grain was to be delivered between September 1, 1980, and October 1, 1980. The Elevator contracted to pay $4.10 per bushel, subject to certain discounts which will be discussed later in this opinion.

On the same day, the Elevator, in accordance with standard industry practice, sold the durum to the Farmers Union Grain Terminal Association [GTA] for $4.75 per bushel—an amount which would provide the Elevator with a net profit of 10¢ per bushel, after deducting the costs of its contract with Schock and transportation to the GTA terminal in Duluth.

Because of a severe spring drought and late summer heavy rains and hailstorms, the Elevator became concerned that Schock would be unable to meet his obligations under the contract. The Elevator therefore made written demand of Schock, pursuant to § 41–02–72 of the North Dakota Century Code, that he furnish adequate assurance of performance. As a result of this demand, a sample of the durum in Schock's grain bins was sent to Jamestown Grain Inspection, Inc., for testing. The test revealed that the sample contained 29.8 percent sprout-damaged kernels.

The Elevator refused to accept the grain on the grounds that it did not conform to the contract description and was not commercially acceptable. The Elevator was then obligated to purchase substitute durum to "cover" its resale commitment to GTA. The average cost over the contract price was an additional $2.05 per bushel. The Elevator also lost its 10¢ per bushel profit on the Schock contract. The total loss arising from the Elevator's "cover" purchases was alleged to be $21,500. The Elevator then commenced this litigation to recover these losses.

Schock subsequently fed some of the damaged grain to his cattle and sold 5,892 bushels of 55- and 56-pound "sample grade" durum to Peavey Company for $3.11 per bushel on April 22, 1981.

The action was tried to the court on November 28, 1982. Judgment was entered in favor of Schock and the Elevator appealed.

The issue presented for review is: Did Schock's grain conform to the contract description?

The grain purchase contract at issue in the instant case is a form contract provided by the Elevator. The contract provides, in relevant part, as follows:

"GRAIN PURCHASE CONTRACT                    Date 3/31/80

John Schock, Seller, of _____ Jamestown, N. Dak. does hereby sell to Urbana F. U. Elev., Buyer, the following described grain:

| H.A. Durum | 60 | —— | 13.50 |
|---|---|---|---|
| Grade and Kind of Grain | Test Wt. | Protein | Moisture |

"The quantity to be delivered on this contract is: 10,000 bushels. The price per bushel for the described grain is: $ 4.10

"If at time of delivery the grade or other factors vary from the above, the following will apply:

"PREMIUMS        .15 Disc. for Amber – .30 Disc. for Durum
AND              For those other factors not shown, the market discount as of
DISCOUNTS        the date hereof will apply.

"The price will be adjusted by the amount of any increase or decrease in freight rates in effect upon completion of delivery. Seller agrees that the grain shall be held by him at his risk until delivered as hereinafter provided. Grain delivered must comply with the Federal Food, Drug and Cosmetic Act, and it shall be optional with Buyer whether it shall accept the grain if the grain is of different kind or grade, or has factors other than specified." [Underlined portions represent handwritten provisions.]

An understanding of the issues involved in this case requires some background information regarding the marketing of durum wheat.

The principal use for durum is human consumption. It is ground into a granular product known as semolina, which is the principal ingredient in pasta. All grain, including durum, is marketed according to standards set by the United States Department of Agriculture in its publication entitled "The Official United States Standards for Grain".

The grain of common wheat is divided into seven classes according to these standards. One of these classes is Durum Wheat. The class of Durum Wheat is further divided into three subclasses: Hard Amber Durum Wheat, Amber Durum Wheat, and Durum Wheat. The official standards define the subclass of Hard Amber Durum as wheat of the Durum class with 75 percent or more of hard and vitreous kernels of amber color. The subclass of Amber Durum is wheat of the Durum class with 60 percent or more but less than 75 percent of hard and vitreous kernels of amber color. Durum Wheat is that subclass of the class of Durum which has less than 60 percent of hard and vitreous kernels of amber color.

"The Official United States Standards for Grain" also sets forth grades and grade requirements for the classes of wheat. These grades are to be designated in the following order: (1) The letters "U.S."; (2) the number of the grade or the words "Sample grade"; and (3) the subclass, e.g., "Hard Amber Durum".

The numeral appearing in an official designation is determined by accounting for various factors related to quality. This numeral may be U.S. No. 1, 2, 3, 4, or 5. Any wheat which does not meet the requirements for Grades U.S. Nos. 1 through 5 is designated "Sample grade".

It is the practice in the grain trade, in contracts for future deliveries such as the one at issue in the instant case, to contract for the purchase of the highest quality grain and then discount the price at the market rate for any defects which might be present in the grade when delivered. It is not entirely uncommon for a grain elevator to purchase grain which has been substantially discounted and blend it with high quality grain, thereby improving the quality of the former and reducing to some extent the quality of the latter. The efficacy of this practice is, however, limited by a number of factors; particularly the extent of damage present in the grain when delivered and the availability of high quality grain to blend.

Weather conditions during the 1980 growing season caused extensive sprout damage to much of the durum crop in North Dakota. Tests of Shock's durum revealed sprout damage of 29.8 percent and approximately 30 percent of hard and vitreous kernels. The official designation for such wheat is "U.S. Sample grade Durum Wheat". Schock contends that under the express terms of the grain purchase agreement, the Elevator was obligated to accept his damaged durum, apply the appropriate discounts at the market rate, and pay him accordingly. The Elevator, on the other hand, claims that the contract called for the delivery of No. 1 Hard Amber Durum, 60 pounds test weight, 13.50 moisture, and that it retained, by virtue of an express provision of the contract, the option of whether to accept durum of lesser quality. The district court found that Schock was entitled to deliver durum wheat in accordance with the terms of the contract and that the Elevator should have accepted the grain for delivery and applied the appropriate discounts.

The trial court based its holding primarily on the conclusion that the grain purchase agreement is a contract of adhesion. In its memorandum opinion, the court stated that:

"The terms of this particular contract have to be construed in favor of the nondrafting party. And those terms militate in favor of the interpretation which I have given this contract; namely, that the Defendant would have the opportunity to deliver durum wheat to the Plaintiff and have the Plaintiff accept it subject to the various discounts that are allowable for amber, for durum, and for the various other factors at appropriate rates.

The Plaintiff, of course, claims that it had the option to reject or accept grain of different kinds or qualities at its choosing. Such a provision has to have some limits, and it is incumbent upon the Plaintiff to set those limits so that the Defendant in this instance would be fully advised of what the limits would be. As long as the grain was a marketable commodity under the classifications of durum listed, the buyer was under the obligation to accept the grain in accordance with the terms of the contract. If the grain had been unmarketable, which was not the case, this grain was marketed to the Peavey Company later on the following spring, then the buyer would have been able to rely on its option of rejecting the grain because it was not marketable. That would be a reasonable limitation of the option provision of the buyer."

▪ The grain purchase agreement in this case was on a form provided by the Elevator. As such, it must be construed most strongly against the Elevator, who prepared it and who presumably looked out for its best interests in the process. The *Farmers Union Grain Terminal Association v. Nelson*, 223 N.W.2d 494, 497 (N.D. 1974); § 9–07–19, N.D.C.C. The particular clause objected to by the district court states that:

"... and it shall be optional with Buyer whether it shall accept the grain if the grain is of different kind or grade, or has factors other than specified."

Section 41–02–64, N.D.C.C. [2–601, U.C.C.] provides:

"*Buyer's rights on improper delivery* .... if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may:

"1. Reject the whole;

"2. Accept the whole; or

"3. Accept any commercial unit or units and reject the rest."

Section 41–02–06(3) [2–106, U.C.C.] provides that:

"3. Goods ... are 'conforming' or conform to the contract when they are

in accordance with the obligations under the contract."

The contract language was merely a restatement of the principle embodied in these statutory provisions, that a buyer can legally reject nonconforming goods. If Schock's durum did not conform to the contract specifications, then the Elevator was well within its rights in rejecting it.

The trial court made no specific finding that Schock's durum conformed to the contract. There is, however, no dispute regarding the quality of Schock's durum. It only remains to determine whether it conformed to the contract description.

The "grade and kind of grain" the grain purchase contract called for was "HA Durum", test weight "60", and moisture "13.-50". The price agreed upon for the delivery of this grain was $4.10. It is undisputed that this price was the highest price available for the finest quality of durum, *i.e.*, U.S. No. 1 Hard Amber Durum. The contract also provided, however, that "If at time of delivery the grade or other factors vary from the above, the following discounts will apply:

"PREMIUMS AND DISCOUNTS:
-.15 Disc. for Amber   .30 Disc. for durum"
        and that
"For those other factors not shown, the market discount as of the date hereof will apply."

Viewing the transaction solely from the perspective of the written contract and interpreting its provisions most strongly in favor of Schock as the nondrafting party, leads us to the conclusion that Schock was obligated to deliver whatever quality of durum wheat he chose and the Elevator was obligated to accept it, subject to the applicable market discounts.

▪ The grain purchase agreement at issue in this case is, however, a contract for the sale of "goods". As such, it must be interpreted in light of the applicable rules contained in Article 2 of the Uniform Commercial Code, codified in Chapter 41–02, N.D.C.C. Section 41–02–15(2), N.D.C.C. [2–208, U.C.C.], provides that:

"2. The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade (section 41–01–15)."

Section 41–01–15, N.D.C.C. [1–205, U.C.C.], contains similar guidelines for an interpretation of a contract for the sale of goods. That section provides, in pertinent part, that:

"*Course of dealing and usage of trade.*

"1. ...

"2. A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court.

"3. A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement.

"4. The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade.

"5. An applicable usage of trade in the place where any part of performance is to occur shall be used in interpreting the agreement as to that part of the performance.

"6. Evidence of a relevant usage of trade offered by one party is not admissible unless and until he has given the other party such notice as the court finds sufficient to prevent unfair surprise to the latter."

These statutes clearly require that a contract for the sale of goods be interpreted in light of the commercial background of the transaction. The courts have, in fact, been quite liberal in finding that additional terms, usages, and other dealings between the parties could be harmonized with apparently contradictory express terms. *See Nanakuli Paving & Rock Co. v. Shell Oil Co.*, 664 F.2d 772 (9th Cir. 1981). In cases governed by the Uniform Commercial Code, the courts have regarded the established practices and usages within a particular trade or industry as a more reliable indicator of the true intentions of the parties than the sometimes imperfect and often incomplete language of the written contract. The courts have allowed such extrinsic evidence to modify the apparent agreement, as seen in the written terms, as long as it does not totally negate it. See *Nanakuli Paving & Rock Co.*, *supra*, and cases discussed therein.

In the case before us, the Elevator contends that, even if it did not retain the option of rejecting grain that was not U.S. No. 1 Hard Amber Durum, Schock's durum nevertheless failed to conform to the contract when read in light of the established practices and usages of the grain trade. The existence and scope of such a practice or usage is to be determined by the trier of fact. Section 41–01–15(2), N.D.C.C.

The record reveals that both parties were aware that the Elevator was contracting for durum to be used for human consumption. Schock's durum, however, because of its excessive sprout damage, was unfit for human consumption. The Elevator presented evidence that durum wheat suffering from sprout damage in excess of 15 percent, was unacceptable to the milling industry because it lacked certain qualities

necessary for the production of pasta. Schock, on the other hand, maintains that evidence of a 15 percent limit on sprout damage was inadmissible because neither party was aware of any such restriction at the time of contracting.

In regard to Schock's contention, we first observe that there is no evidence or assertion that an awareness of the 15 percent limitation on damage would have enabled Schock to deliver durum within that limitation. The damage in this case was caused, not through any negligence or lack of expertise on the part of Schock, but by weather conditions beyond his control—a gamble inherent in farming. Second, the contract does not identify as its object the durum to be produced by Schock during the 1980 crop year. Such an interpretation would be utterly inconsistent with the subsequent sale of durum by the Elevator to GTA. Schock's own testimony revealed that he was aware of the industry's practice of immediate resale and that the Elevator would commit itself to deliver durum into the market for human consumption in reliance on his contract.

Turning to the Elevator's assertion that Schock's grain was unacceptable on the market for human consumption, we observe that the 15 percent limitation is imposed at the end of the distributive chain by the milling industry. The evidence in the record, however, suggests that such a limitation may not be equally applicable to the sale of durum by the farmer to a local elevator. As noted earlier in this opinion, it is not uncommon for an elevator to purchase damaged grain at a reduced price and blend it with a higher quality of grain. Both sides to this dispute presented evidence of this practice. Schock presented the testimony of the Elevator's acting manager who entered into the contract with him on March 31, 1980. It was the acting manager's testimony that the Elevator could have profitably purchased Schock's durum subject to the appropriate discounts,

blended it with a high quality durum on hand, and still have reaped a profit on the transaction. The Elevator produced the conflicting testimony of the subsequent manager of the Elevator, who testified that Schock's durum was too badly damaged and, due to the weather conditions during the growing season, there was too little high quality grain on hand to blend and thereby make Schock's grain marketable.[1]

■ In its memorandum opinion, the district court stated that:

"As long as the grain was a marketable commodity under the classifications of durum listed, the buyer was under the obligation to accept the grain in accordance with the terms of the contract."

The court then found that because the durum was marketed as cattle feed during the following spring, it was therefore a marketable commodity. We agree that if the durum was a marketable commodity, the Elevator was obligated under the contract to accept it. The testimony is undisputed, however, that the grain feed market is entirely separate from the market for human consumption. The relevant consideration is, therefore, whether Schock's durum was acceptable on the market contemplated by the parties at the time of contracting, i.e., the market for human consumption. If, as Schock contends, the Elevator could have successfully marketed his durum by blending it, the Elevator was obligated to do so. If, on the other hand, the circumstances were such that blending would have been commercially unreasonable, then the Elevator was within its rights in rejecting the durum as nonconforming. The resolution of this question is for the trier of fact—in this case, the district court. We therefore vacate the judgment of the district court and remand for further proceedings in accordance with this opinion. On remand, the district court

---

1. Russell Carlson was the acting manager of the Urbana Farmers Union Elevator Co. on March 31, 1980. It was he who executed the contract on behalf of the Elevator. Edwin Auch became manager of the Elevator in June 1980. In that capacity Mr. Auch rejected Schock's tender of delivery.

may, in the exercise of its sound discretion, take additional evidence in the matter.

Judgment vacated and remanded.

ERICKSTAD, C.J., and PEDERSON, VANDE WALLE and SAND, JJ., concur.