**DAWN ENTERPRISES, a North Dakota Limited Partnership, Plaintiff and Appellant,**

v.

**Charles O. LUNA and Judith A. Luna, Defendants and Appellees,**

**and**

**Ultrafuels, Incorporated, Third Party Defendant.**

**DAWN ENTERPRISES, a North Dakota Limited Partnership, Plaintiff and Appellee**

v.

**Charles O. LUNA and Judith A. Luna, Defendants and Appellants**

**and**

**Ultrafuels, Incorporated, Third Party Defendant**

**Civil Nos. 11,178 and 11,306.**

Supreme Court of North Dakota.

Jan. 20, 1987.

Pearce & Durick, Bismarck, Gibson, Dunn & Crutcher, Newport Beach, Cal., for plaintiff and appellant and plaintiff and appellee; argued by Patrick W. Durick.

Kennelly & Pederson, Fargo, for defendants and appellees and defendants and appellants; argued by W.J. Bill Kennelly; appearance by Timothy J. Pederson.

LEVINE, Justice.

This is a consolidated appeal by Dawn Enterprises from a summary judgment entered by the district court in favor of Charles O. and Judith A. Luna and by the Lunas from an order in which the district court determined that there were no issues remaining for adjudication. We reverse and remand.

Dawn and the Lunas entered into a contract on October 26, 1983, for the Lunas to purchase up to two million gallons of anhydrous ethyl alcohol (ethanol) from Dawn.[1] The contract was executed during the con-

---

1. The original parties to the contract were Ultrafuels, Inc., and the Lunas; however, Ultrafuels assigned its interest in the contract to Dawn.

struction of Dawn's ethanol plant at Walhalla, North Dakota. The parties' dispute arises from the following provisions in the contract:

"The products sold hereunder shall be delivered by Seller at its refinery into Buyer's receiving facilities; i.e., railroad tank cars or tank trucks, in accordance with such schedules as the parties may agree upon from time to time.

\* \* \* \* \* \*

"The price for ethanol delivered by Seller F.O.B. point of delivery by Seller into Buyer's receiving facilities shall be the *lowest competitive market price for ethanol at point of delivery.*" [Emphasis added.]

Subsequent to the execution of the contract and before Dawn began producing ethanol at the Walhalla plant, the 1985 North Dakota Legislature amended the motor vehicle fuels tax by preserving a tax advantage for ethanol produced in North Dakota or in states with reciprocal exemp-tions for North Dakota produced ethanol (qualifying ethanol) and repealing a tax advantage for ethanol produced in states without a reciprocal exemption (non-qualifying ethanol). Section 57–43.1–02, N.D. C.C.[2] The legislation created different market prices for qualifying and non-qualifying ethanol. When this action was commenced, the market price for qualifying ethanol was $1.92 per gallon or approximately $.40 per gallon higher than the market price for non-qualifying ethanol.

The Lunas found a seller offering to sell them non-qualifying ethanol for $1.52 per gallon and requested that Dawn sell them qualifying ethanol produced at the Walhalla plant at that price. Dawn refused and commenced this declaratory judgment action against the Lunas seeking a declaration that the lowest competitive market price for ethanol at the point of delivery was $1.92 per gallon. The Lunas answered, generally denying the allegations in the complaint, and, alternatively, sought a dec-

---

**2.** 1985 N.D.Sess.Laws Ch. 646, § 1, provides: "57–43.1–02. Tax imposed on motor vehicle fuels—Tax reduced for ~~agriculturally-derived~~ certain alcohol-blended fuels.

"1. Except as otherwise provided in this section, a tax of thirteen cents per gallon [3.79 liters] is imposed on all motor vehicle fuel sold or used in this state.

"2. The tax imposed on gasoline sold which contains a minimum ten percent blend of ~~an agricultural ethyl~~ a qualifying alcohol ~~or methanol~~ whose purity is at least ninety-nine percent alcohol is <u>reduced in accordance with this subsection and subsection 3. An alcohol is a qualifying alcohol if it is methanol produced from coal or if the taxpayer certifies that it is derived from agricultural products produced entirely in the United States. For qualifying alcohols, the tax is:</u>

"a. ~~Through December 31, 1983, four cents per gallon [3.79 liters] less than the tax imposed under subsection 1.~~

"~~b. From January 1, 1984, through December 31, 1984, five cents per gallon [3.79 liters] less than the tax imposed under subsection 1.~~

"~~c. From January 1, 1985, through December 31, 1985, six cents per gallon [3.79 liters] less than the tax imposed under subsection 1.~~

"~~d.~~ From ~~January 1, 1986~~ <u>July 1, 1985,</u> through June 30, ~~1992~~ <u>1987,</u> ~~four~~ <u>eight</u> cents per gallon [3.79 liters] less than the tax imposed under subsection 1.

"~~e.~~ <u>b. From July 1, 1987, through December 31, 1992, four cents per gallon [3.79 liters] less than the tax imposed under subsection 1.</u>

"c. After ~~June 30~~ <u>December 31,</u> 1992, at the same rate as the tax imposed under subsection 1.

"3. <u>The tax reduction allowed on gasoline under this section does not apply to gasoline which contains qualifying alcohol manufactured or distilled outside this state, unless the state where the alcohol is manufactured or distilled provides a specific reduction, exemption, credit, or refund from that state's motor vehicle fuels tax for what would be a qualifying alcohol manufactured or distilled in this state. Qualifying alcohols manufactured or distilled in another state are eligible for the tax reduction allowed by this section, but only to the extent that state's specific reduction, exemption, credit, or refund allowance applies to qualifying alcohol manufactured or distilled in this state. The tax reduction allowed by this subsection qualifying alcohol manufactured or distilled in another state cannot exceed the amount specified in subsection 2.</u>

"~~3.~~ <u>4.</u> The dealer shall collect the tax imposed by this section from the consumer on all sales.

"~~4.~~ <u>5.</u> Sales of fuel in the original package may be made to a licensed dealer, and the dealer may collect the tax imposed by this chapter, but on sales in the original package to persons other than licensed dealers, the dealer is liable for the tax." (Deleted language struck, new language underscored.)

laration that the lowest competitive market price for ethanol was approximately $1.50 per gallon. The Lunas also counterclaimed and filed a third-party complaint against Ultrafuels, alleging a breach of contract resulting in lost profits of approximately $70,000 per month.

Dawn moved for summary judgment, seeking a declaration that the lowest competitive market price for ethanol at the point of delivery was $1.92 per gallon or, alternatively, that, if it were required to sell the Lunas ethanol at the lower price, it did not have to sell them ethanol produced at its Walhalla plant. The Lunas resisted Dawn's motion and moved for summary judgment ordering Dawn to sell them ethanol produced at the Walhalla plant at approximately $1.50 per gallon.

The district court granted summary judgment for the Lunas, finding that the contract clearly and unambiguously required Dawn to sell them ethanol produced at the Walhalla plant for $1.52 per gallon. Dawn appealed, and the Lunas moved to dismiss, asserting that their counterclaim and third-party complaint remained for resolution by the trial court. Dawn resisted the Lunas' motion, asserting that no issues

remained for trial. We remanded to the district court for a determination that either no unresolved issues remained for trial or there was no just reason for delay pursuant to Rule 54(b), N.D.R.Civ.P. On remand the district court determined that no issues remained to be resolved, and thereafter we denied the Lunas' motion to dismiss Dawn's appeal. The Lunas subsequently appealed from the district court's order on remand, and we have consolidated the appeals.

The determinative issue raised in this appeal involves the proper interpretation of the pricing clause in the ethanol sales contract. Both parties agree that the proper interpretation of the contract involves a determination of whether or not the contract is ambiguous, and, if it is ambiguous, that extrinsic evidence may be introduced to determine the parties' intent, thereby necessitating a resolution of factual issues and precluding summary judgment.[3] *Johnson v. Mineral Estate, Inc.*, 343 N.W.2d 778 (N.D.1984).

Whether or not a contract is ambiguous is a question of law for the court to decide. *Johnson v. Mineral Estate, Inc., supra.*

---

3. While the parties' arguments are directed to whether or not the contract is ambiguous so as to warrant extrinsic evidence to clarify their intent thereby precluding summary judgment, we note that the subject matter of the contract, ethanol, is "goods" as defined in Section 41–02–05(2), N.D.C.C. [U.C.C. § 2–105(2) ], and therefore the provisions of Article 2 of the U.C.C. are applicable to the contract. Section 41–02–02, N.D.C.C. [U.C.C. § 2–102]. Under the U.C.C., relevant extrinsic evidence of the commercial context of a contract is admissible to aid in interpreting a contract. Section 41–02–09, N.D.C.C. [U.C.C. § 2–202]. The Official Comment to that section makes clear that a contract need not be ambiguous for the admission of evidence of course of performance, course of dealing, or usage of trade because the proper interpretation of an agreement requires the court to familiarize itself with the commercial context in which language of the contract is used. *See Peoples Bank and Trust v. Reiff,* 256 N.W.2d 336, 341 (N.D.1977); *Paragon Resources v. National Fuel Gas Distribution,* 695 F.2d 991, 996 (5th Cir. 1983); *Chase Manhattan Bank v. First Marion Bank,* 437 F.2d 1040, 1046 (5th Cir.1971).

In *Paragon Resources v. National Fuel Gas Distribution, supra,* 695 F.2d at 996, the Fifth

Circuit Court of Appeals outlined the following three-step inquiry for interpreting a contract under the U.C.C.:

"The U.C.C. thus adds a third level to a traditional two-level inquiry. Instead of asking, 'Were the contract terms ambiguous' and then, 'If they were ambiguous what do they mean in light of extrinsic evidence' the Code poses three inquiries:

"1. Were the express contract terms ambiguous?

"2. If not, are they ambiguous after considering evidence of course of dealing, usage of trade, and course of performance?

"3. If the express contract terms by themselves are ambiguous, or if the terms are ambiguous when course of dealing, usage of trade, and course of performance are considered (that is, if the answer to either of the first two questions is yes), what is the meaning of the contract in light of all extrinsic evidence?"

We also note that course of dealing and usage of trade may be negated by express terms of a contract. Section 41–01–15(4), N.D.C.C. [U.C.C. § 1–205(4)]. See *Thiele v. Security State Bank,* 396 N.W.2d 295, (N.D.1986).

A contract is ambiguous when reasonable arguments can be made in support of contrary positions as to its meaning. *Graber v. Engstrom*, 384 N.W.2d 307 (N.D.1986).

Dawn contends that the district court erred in granting summary judgment because there are two reasonable interpretations of the pricing clause different from that reached by the district court. We agree.

First, Dawn asserts that the Legislature created two competitive market prices for ethanol when it repealed the tax advantage for non-qualifying ethanol. Dawn argues that, when the contract was executed, one of the fundamental assumptions of the parties was that the Lunas would be purchasing ethanol that qualified for the tax advantage because that was the only type of ethanol existing. The Lunas respond that the distinction between qualifying and non-qualifying ethanol is not rational because that distinction did not exist when the contract was executed and, thus, they assert that the only reasonable interpretation of "lowest competitive market price for ethanol" is the lowest price available regardless of whether or not the ethanol qualified for a tax advantage.

In *North Central Airlines v. Continental Oil Co.*, 574 F.2d 582 (D.C.Ct.App.1978), the court held that unforeseen changed circumstances affecting the underlying assumptions of the parties created an ambiguity in the pricing provisions of a contract. In that case the court interpreted the meaning of the term "posted price" in a contract tying the price of aviation fuel to prices posted in the industry for crude oil. When the contract was executed there was one posted price for crude oil; however, the Federal Cost of Living Council subsequently enacted two-tier crude oil price controls resulting in different prices for exempt and non-exempt oil, and both prices were subsequently "posted." The court concluded that those changed circumstances created different prices for exempt and non-exempt oil and both prices were posted prices within the meaning of the contract.

Similarly, in *Pennzoil Co. v. Federal Energy Regulatory Comm'n*, 645 F.2d 360, 388 (5th Cir.1981), the court said:

"[S]ince perception is conditioned by environment, it is proper to consider the contract's commercial setting even though the contract is not facially ambiguous. Furthermore, ambiguity often arises from the application of the contract to the subject matter of the agreement, and extrinsic evidence is admissible to remove and explain any ambiguity in the contract as applied. Ambiguity easily arises when the contract is applied to its subject matter in changed circumstances. Area rate clauses are certainly ambiguous as applied to the collection of currently available ceiling rates for natural gas. A contract should be interpreted in light of the changed circumstances to accomplish what the parties intended." [Citations omitted.]

■ In the instant case the 1985 legislation resulted in different tax rates for qualifying and non-qualifying ethanol. This changed circumstance must be considered within the contract's commercial context to accomplish what the parties intended. Within the commercial context of this contract, it is reasonable to conclude that the pricing clause refers to ethanol qualifying for the tax advantage because that was the only type of ethanol existing when the contract was executed; however, it is equally reasonable to conclude that the pricing clause refers to ethanol selling at the lowest price regardless of whether or not it qualified for a tax advantage. After considering the effect of the changed circumstances on the commercial setting of the contract and the fundamental assumptions that the parties may have had when the contract was executed, we believe that the pricing clause is subject to more than one reasonable interpretation in this respect and therefore is ambiguous.

■ As a second reasonable interpretation of the contract, Dawn proposes that the price to be paid by the Lunas was the same price that anyone else purchasing ethanol from their Walhalla plant would

pay because the contract required Dawn to deliver the ethanol to the Lunas at the Walhalla refinery. The Lunas counter that considering only Dawn's product and price renders the terms "competitive" and "market" meaningless. The Lunas also argue that the "at point of delivery" language does not mean at Dawn's Walhalla refinery but refers to the place that other possible sellers would deliver ethanol to the Lunas.

After reviewing the "at point of delivery" language in conjunction with the entire contract, and particularly the clause requiring that the ethanol "shall be delivered by Seller [Dawn] at its refinery into Buyer's [Lunas] receiving facilities," we believe that the pricing clause is subject to more than one reasonable interpretation in this respect and therefore is ambiguous.

Accordingly, we conclude that the contract is ambiguous. Since the meaning of an ambiguous term is an issue of fact subject to presentation of extrinsic evidence, summary judgment was inappropriate, and we reverse and remand for further proceedings. Because of our resolution of the issue raised by Dawn on its appeal, any discussion of the issues raised by the Lunas on their cross-appeal is unnecessary, and we decline to address those issues.

The case is reversed and remanded for further proceedings.

ERICKSTAD, C.J., and VANDE WALLE, GIERKE, MESCHKE, JJ., concur.