1998 ND 85

**CAMPBELL FARMS, Faulkner Farms, and Empire Cattle Co., Plaintiffs and Appellees,**

v.

**Andrew WALD, Defendant and Appellant.**

Civil No. 970220.

Supreme Court of North Dakota.

April 28, 1998.

Robin W. Forward, of Kelsch, Kelsch, Ruff & Kranda, Mandan, for plaintiffs and appellees.

Jos. A. Vogel, Jr., of Vogel Law Firm, Mandan, for defendant and appellant.

MESCHKE, Justice.

[¶ 1] Andrew Wald appealed a judgment for Campbell Farms, Faulkner Farms, and Empire Cattle Co. (the Buyers) against Wald awarding damages and refund of the purchase price of an immature Simmental bull. We conclude the trial court should not have ordered partial summary judgment for the price of the bull, and we reverse and remand.

[¶ 2] On February 5, 1994, the Buyers bought Hero, a ten-month-old Simmental bull, for $14,506.50 from Wald, who has been raising cattle for over 40 years. Wald's brochure for the sale of his bulls, including Hero, at Kist Livestock in Mandan contained a limited guarantee:

1. GUARANTEES: Buyer must accept responsibility of getting bulls semen checked shortly before the breeding season and to make sure they're active breeders. I cannot be held responsible for any problems after the breeding season.

The Buyers took Hero to Alabama. Beginning in March 1994, the Buyers had Hero's semen tested frequently. In April 1994, the Buyers notified Wald that Hero's semen was unsatisfactory. In an April 29, 1994, letter to the Buyers, Wald replied:

Until we know for certain that he's not a good semen producer—we will admit only that his semen output is unsatisfactory at this time and any interest/possible semen sales will have to be delayed or canceled.

* * * * * *

But, its probable that Hero needs more time!

* * * * * *

If your not satisfied with my response ship Hero to me immediately (at my cost) when I determine that he's not fertile (we should know by fall) I will refund your money without reservation.

The Buyers shipped Hero to Wald in July 1994.

[¶ 3] After the Buyers returned Hero, Wald gave him eight days of rest and placed him with 100 cows as a clean up bull after a sixty-day breeding cycle. Hero settled all eight cows that recycled. Wald had Hero tested by Nokota Genetics in Minot in October and November 1994. In a December 6, 1994 letter, Nokota Genetics reported:

We have collected and processed excellent quality semen on a Simmental bull known as [ ]WSR Hercs Pld Hero, stud code SM146, between 10–24–94 and 11–28–94, a total of 247 straws. The bull would be classified as a sound breeder in all regards to fertility.

[¶ 4] In 1995, the Buyers sued Wald for damages and return of the purchase price. The Buyers alleged Wald "warranted and represented ... said bull was both a sound breeder and that said bull would produce sufficient quantities of good quality semen to be sold commercially." The Buyers also al-

leged Hero "was never able to produce the quality or quantity of semen required," and that they offered to return Hero, but Wald refused to accept his return or to repay the purchase price. Wald answered, alleging Hero was a sound breeder with excellent quality semen, and counterclaimed for Hero's care after July 11, 1994.

[¶ 5] The Buyers moved for summary judgment "on the basis that the good they purchased from [Wald] was nonconforming," with affidavits asserting:

1.... We had planned to use the bull to impregnate cows and to produce semen to be sold.

2. The terms of the bull sale were set out in the sales brochure and orally by Wald. The written terms included a guarantee pertaining to the bull's semen which set out that checking the semen before the breeding season would be the responsibility of the buyer....

3. At our direction, the bull's semen was checked from March 25, 1994 to June 14, 1994, by Cottage Farm[ ] Genetics ... nine different times. Only one of those examinations produced good semen and the volume of that collection was small....

4. We attempted to impregnate cows with the bull seven different times with no success.

5. Wald was notified of the semen problem by us in mid-April 1994. Wald replied by a letter dated April 29, 1994, in which he admits the bull's semen was unsatisfactory and he urged us to give the bull time to come around.... As described in paragraph 3, further examinations indicated the semen continued to be inadequate and therefore, we shipped the bull back to Wald in July 1994. He refused to refund our purchase price.

[¶ 6] The Buyers' affidavits attached an undated letter from Wesly Klipfel of Cottage Farm Genetics in Tennessee that said:

In your desperation to have hoped he would come around, the bull spent over three (3) months here and at the end of that time with a weeks rest in between collection days was able to put up only 3C

units of semen on May 24th which the quality was good.

In my seventeen (17) years of collecting semen and evaluating bulls it is easy for me to say that this bull was at very best slow maturing or poss[i]bly genetical[l]y inferior in his reproductive ability. In looking at just Simmental bulls the majority of 11 to 12 month old bulls would produce 2 to 3 times the sperm cells this midmature had produced.

\* \* \* \* \* \*

This problem could also very well be one that was caused from a virus or injury during pubertal maturity and could turn around in 1 to 2 years, but is a gamble. Anyway it is viewed this bull was not a normal sperm producing individual and should be recognized as such.

[¶ 7] Wald resisted the Buyers' motion for summary judgment with his affidavit: (1) "During the past thirty years, a custom and usage has developed by the industry which results in selling yearling registered bulls instead of two year old bulls;" (2) "Cattleman purchasing yearling bulls put them on a growing and maturing program of light grain ration and pasture" and "a light breeding program;" (3) "Some purchasers at the end of a 60 day breeding cycle ... turn out the yearling bulls to settle cows that failed to breed back during the normal 60 day period;" (4) other purchasers will place a yearling bull "with approximately 10 to 20 heifers or cows during the breeding cycle of 60 days;" (5) "The preceding is consistent with the guarantee that buyer accepts responsibility of getting the bull semen checked shortly before the breeding season to make sure the bull is an active breeder. Yearling bulls are not mature enough to breed a large number of cows or become a semen factory;" (6) "The term 'active breeder' as appears in my guarantee, embodies the expected performance and use of a yearling bull as discussed previously;" and (7) "A registered yearling bull is only expected, commencing June 1 in the year he is purchased, to settle a few cows, do a lot of growing and maturing." Wald also swore:

12. The [Buyers] informed the Affiant that after they received delivery of Hero in Alabama he was immediately turned into a pen of cows. Hero appeared aggressive and the [Buyers] placed him in a stud program in Kentucky to gather large commercial quantities of semen for sale for artificial insemination of cows. This is completely opposite of what the [Buyers] represented to the Affiant how Hero would be used. Maybe to the southern PhD educated gentlemen, it is a change of mind. To the Affiant it is an illustration of greed and untruthfulness and disrespect for the Affiant and the animal he sold to the [Buyers].

\* \* \* \* \* \*

16. [The Buyers] sent Hero back home. After Hero arrived home on July 20, 1994, Affiant gave him eight (8) days to rest. Then on July 28, 1994, Affiant put Hero with approximately 100 cows as a clean up bull (mature herd bulls taken out after the 60 day cycle). Hero settled all the cows which recycled (8).

17. Affiant took Hero to Nokota Genetics (Nokota) in Minot, North Dakota, for fertility tests on October 24, 1994.... The tests were positive. The [Buyers] were notified of the results. They responded that Hero wasn't collected long enough. Affiant took Hero back to Nokota on November 28, 1994.... Affiant again informed the [Buyers] of the results and they refused delivery of Hero.

\* \* \* \* \* \*

21. If the [Buyers] had not lied to Affiant and given the bull more concern about how they were going to use Hero, and taken my advice, they would have made a good investment. Hero remains in my breeding program and is doing well breeding cows and producing top line calves.

[¶ 8] The trial court ordered partial summary judgment for the Buyers for the purchase price of the bull, ruling:

The Court concludes that a ruling on this motion must necessarily be based on the record of evidence between the time of the sale in February 1994 and the decision to return the bull in July 1994. The record of evidence for that period is unrebutted by

[Wald] and the record clearly sets forth a basis for the [Buyers'] decision that Hero did not conform to their expectations or to reasonable standards regarding reproductive capacity. The actions of the [Buyers] constituted a revocation of their acceptance under § 41–02–71 of the Uniform Commercial Code.

  \*    \*    \*    \*    \*    \*

The Court concludes that the subsequent success Hero has demonstrated since his return to [Wald] does not create a question of fact for a Judge or Jury as to whether the [Buyers'] actions in July of 1994 were proper.

[¶ 9] In denying Wald's later motion to reconsider, the court ruled:

[Wald] argues that custom and usage would suggest that the parties could not have contemplated that Hero could be a productive bull in the initial breeding season. This reasoning is at odds with the express terms of the agreement which obligated the [Buyers] to verify sperm quality within a short time after the purchase.

The court entered a partial judgment awarding the Buyers the $14,506.50 purchase price of the bull.

[¶ 10] After a trial on other damages, the trial court found the Buyers were also entitled to $350 for trucking, $870 for insurance, and $1,447.40 for expenses at Cottage Farm Genetics.[1] The final judgment awarded the Buyers $19,474.45 for the price, damages, and interest. Wald appealed, contending the trial court erred in summarily ordering rescission of the sale and refund of the purchase price of the bull.

[¶ 11] Summary judgment is an expeditious procedure for deciding a case without a trial if, after viewing the evidence in the light most favorable to the party opposing the motion and giving that party the benefit of all favorable inferences that might reasonably be drawn from the evidence, there is no genuine dispute about either the material facts or about the inferences to be drawn from the undisputed facts, or if only a question of law is presented. *Hougum v. Valley Mem'l Homes*, 1998 ND 24, ¶ 7, 574 N.W.2d 812. "Disputes of fact become questions of law if reasonable persons can draw only one conclusion from the evidence." *Id.* at ¶ 8. "Summary judgment is inappropriate if the court must draw favorable inferences and make 'findings' on disputed facts to support the judgment." *Greenfield v. Thill*, 521 N.W.2d 87, 92 (N.D.1994). On appeal, as *Buckingham v. Weston Village Homeowners Ass'n*, 1997 ND 237, ¶ 7, 571 N.W.2d 842, explained, we decide if the evidence available to the trial court entitled the moving party to judgment as a matter of law.

[¶ 12] We must decide whether, indisputably, Hero did not conform to the sale agreement, whether evidence of trade usage can be used to interpret the sale agreement, and whether the Buyers timely revoked their acceptance of Hero when they returned him to Wald.

[¶ 13] A buyer may reject goods that "fail in any respect to conform to the contract." NDCC 41–02–64 (UCC 2–601). "Rejection of goods must be within a reasonable time" and "is ineffective unless the buyer seasonably notifies the seller." NDCC 41–02–65 (UCC 2–602). Without seasonable notification of rejection, a buyer's rejection of nonconforming goods is ineffective. *Official Comment*, UCC 2–601. Under NDCC 41–02–71 (UCC 2–608), a buyer may revoke an acceptance of nonconforming goods. A "[r]evocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and ... is not effective until the buyer notifies the seller of it." *Id.*

[¶ 14] A breach of warranty can be a nonconformity that triggers the right to revoke acceptance of goods. *Hart Honey Co. v. Cudworth*, 446 N.W.2d 742, 745 (N.D. 1989). Under NDCC 41–02–71 (UCC 2–608), questions of nonconformity with a contract for the sale of goods, substantial impairment of value, and timely notice of revocation are usually questions of fact. *Hart Honey Co.*,

---

1. The Buyers had placed Hero with "Cottage Farms Genetics which is a bull collection station near Jackson, Tennessee ... [f]or semen collection" for 125 days "to collect semen for freezing to use in artificial insemination."

446 N.W.2d at 745. *See also Marine Mart, Inc. v. Pearce*, 252 Ark. 601, 480 S.W.2d 133, 137 (1972) ("What constitutes a non-conforming delivery, acceptance, rejection, or revocation of acceptance are questions of fact."); *Ford Motor Credit Co. v. Caiazzo*, 387 Pa.Super. 561, 564 A.2d 931, 936 (1989) (whether nonconformity exists and what is a reasonable time for rejection of defective goods are questions of fact).

■ [¶ 15] Whether Hero conformed to the sale agreement requires a determination of whether he was an "active breeder" as warranted in Wald's sale brochure, and that is a question of fact. *See Torstenson v. Melcher*, 195 Neb. 764, 241 N.W.2d 103, 106–07 (1976) (a bull's status as a "breeder" was a question of fact for the jury). That factual question precluded summary judgment here.

■ [¶ 16] "Section 41–02–09, N.D.C.C., changes the common law of contracts and liberalizes the application of the parol evidence rule to writings evidencing a contract for the sale of goods." *Herman Oil, Inc. v. Peterman*, 518 N.W.2d 184, 188 (N.D.1994). "Under the U.C.C., relevant extrinsic evidence of the commercial context of a contract is admissible to aid in interpreting a contract." *Dawn Enterprises v. Luna*, 399 N.W.2d 303, 306 n. 3 (N.D.1987). Under NDCC 41–01–15 (UCC 1–205) and NDCC 41–02–15 (UCC 2–208), a contract for the sale of goods is to be interpreted in light of the commercial background of the transaction. *Urbana Farmers Union Elev. Co. v. Schock*, 351 N.W.2d 88, 92 (N.D.1984). As we explained in *Urbana:*

In cases governed by the Uniform Commercial Code, the courts have regarded the established practices and usages within a particular trade or industry as a more reliable indicator of the true intentions of the parties than the sometimes imperfect and often incomplete language of the written contract. The courts have allowed such extrinsic evidence to modify the apparent agreement, as seen in the written terms, as long as it does not totally negate it.

351 N.W.2d at 92. Our opinion in *Dawn Enterprises*, 399 N.W.2d at 306 n. 3, explained, "the proper interpretation of an agreement requires the court to familiarize itself with the commercial context in which language of the contract is used."

■ [¶ 17] A sale agreement may not be contradicted by evidence of other agreements, but may be explained or supplemented by course of dealing,[2] course of performance,[3] or usage of trade.[4] NDCC 41–02–09 (UCC 2–202). The Uniform Commercial Code assumes the parties so phrased their sale contract that, unless otherwise specifically excluded, course of dealing, course of performance, and usage of trade "were included in the contract even if not expressly so stated." Alphonse M. Squillante, *Commercial Code Review*, 78 Com.L.J. 89, 90 (1973). Unless negated, these courses and usages "become an element of the meaning of the words used" in a written document. *Official Comment*, UCC 2–202. A sale contract need not be ambiguous for the admission of evidence of course of dealing, course of performance, or usage of trade. *Herman Oil, Inc.*, 518 N.W.2d at 189; *Dawn Enterprises*, 399 N.W.2d at 306 n. 3. Thus, Wald's evidence of a usage of trade is admissible to

**2.** "A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." NDCC 41–01–15(1) (UCC 1–205(1)). A course of dealing cannot be inferred from a single transaction. *V.J. Gautieri, Inc. v. State*, 195 A.D.2d 669, 599 N.Y.S.2d 766, 768 (1993); 1A Ronald A. Anderson, *Uniform Commercial Code*, § 1–205:92 (3rd ed.1996).

**3.** "[C]ourse of performance relates to the conduct of the parties under the contract in question subsequent to its formation." 1A Ronald A.

Anderson, *Uniform Commercial Code* § 1–205:86 (3rd ed.1996).

**4.** "A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question." NDCC 41–01–15(2) (UCC 1–205(2)). "The existence and scope of such a usage are to be proved as facts." *Id. See also Hager v. Devils Lake Public School Dist.*, 301 N.W.2d 630, 634 (N.D.1981), and *Tong v. Borstad*, 231 N.W.2d 795, 798 (N.D.1975), each holding the existence of a custom or usage is a question of fact.

aid in interpreting this sale agreement and to aid in determining if Hero conformed to the agreement.

[¶ 18] The evidence before the trial court showed Hero's semen was unsatisfactory shortly after the Buyers purchased him, but it improved as he matured, until by December 6, 1994, Nokota Genetics declared he "would be classified as a sound breeder in all regards to fertility." The trial court ruled the Buyers' motion for summary judgment "must necessarily be based on the record of evidence between the time of the sale in February 1994 and the decision to return the bull in July 1994." However, the evidence presented for summary judgment did not unequivocally show the Buyers' return of Hero in July 1994 was their rejection of the bull, or their revocation of acceptance, that would limit consideration of the evidence.[5]

[¶ 19] The Buyers' return of Hero to Wald in July 1994 may have been in response to Wald's April 29, 1994 letter suggesting that "its probable that Hero needs more time" and to "ship Hero to me ... when I determine that he's not fertile (we should know by fall) I will refund your money without reservation." The parties were still having the bull tested in October and November 1994. The record does not show when the Buyers asked for their money back and the affidavits do not give a date when the Buyers revoked their acceptance. The affidavit evidence did not indisputably establish, as the trial court believed, that the Buyers' actions "constituted a revocation of their acceptance under § 41–02–71 of the Uniform Commercial Code." We conclude the affidavit evidence raised a genuine issue about material facts on the Buyers' intent in shipping Hero back to Wald, that also precluded summary judgment.

[¶ 20] In denying Wald's motion for relief from the order granting partial summary judgment, the trial court ruled Wald's affidavit evidence of custom and usage was "at odds with the express terms of the agreement." However, NDCC 41–02–15(2) ex-

plains, "express terms of the agreement and ... usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control ... usage of trade." "[I]nterpreted in light of the commercial background of the transaction," *Urbana Farmers Union Elev. Co. v. Schock*, 351 N.W.2d at 92, we conclude the parties' intentions, and the reasonableness of construing the usage of the trade and the express language of the agreement as consistent with each other, are genuine issues of material fact that precluded the partial summary judgment.

[¶ 21] We reverse the judgment and remand for trial of the factual questions.

[¶ 22] VANDE WALLE, C.J., and SANDSTROM, NEUMANN and MARING, JJ., concur.

---

5. At the damage trial, Wald testified he did not know until told by Dr. Campbell, owner of Campbell Farms, in December 1994, that the Buyers did not want the bull. Dr. Campbell testified he had a dispersion sale on December 10, 1994, and "Faulkner's farm is also selling out."