NOT DESIGNATED FOR PUBLICATION

No. 117,544

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

DUANE HURTIG and JOYCE HURTIG,
*Appellees*,

v.

JAMES D. MATTOX and SHARON M. MATTOX,
CO-TRUSTEES OF THE ROSEMARY A. MATTOX REVOCABLE TRUST
DATED OCTOBER 25, 2011,
*Appellants*.

MEMORANDUM OPINION

Appeal from Sumner District Court; R. SCOTT MCQUIN, judge. Opinion filed December 22, 2017.
Affirmed.

*Patrick B. Hughes*, of Adams Jones Law Firm, P.A., of Wichita, for appellants.

*H. Douglas Pfalzgraf*, of Pfalzgraf Law Office, of Wellington, for appellees.

Before GARDNER, P.J., GREEN, J, and MERYL D. WILSON, District Judge, assigned.

PER CURIAM: Duane Hurtig and Joyce Hurtig had oral year-to-year leases with Harold and Rosemary Mattox for the tract of land on which the Hurtigs' cabin sat. That land was later put into a trust. Upon Rosemary's death, her children, James and Sharon, became co-trustees of the Revocable Trust and terminated the year-to-year lease with the Hurtigs. The Hurtigs brought a lawsuit seeking compensation for improvements they had made to their cabin. The district court found no binding contract existed, but awarded the Hurtigs $70,000 in damages based on their equitable theories of unjust enrichment and

1

promissory estoppel. James D. Mattox and Sharon M. Mattox, co-trustees of the Rosemary A. Mattox Revocable Trust, appeal. Finding no error, we affirm.

*Factual and procedural background*

Beginning in 1948, Joyce's father leased a tract of land for camping and recreational purposes from the Walton family. When Joyce married Duane Hurtig, she and Duane took over that year-to-year lease. The land the Hurtigs leased from the Waltons was located near the Ninnescah River. On that land was a primitive cabin owned by the Hurtigs that had only "some modern conveniences."

Harold and Rosemary Mattox leased land from the Waltons on a tract of land adjacent to the land the Hurtigs leased. Harold and Rosemary had a primitive cabin on their leased land as well. The Hurtigs and the Mattoxes enjoyed a long friendship and often visited each other's cabin.

In 2000, the Waltons deeded the land with the two primitive cabins on it to Harold and Rosemary. The deed required that Harold and Rosemary give the Waltons or their immediate family the right of first refusal in the event that Harold and Rosemary ever sold or assigned the land to anyone outside their immediate family. In 2002, Harold and Rosemary deeded the land to the Mattox Living Trust (Living Trust), of which they were both settlors and trustees.

After the Waltons deeded the land to Harold and Rosemary, the Hurtigs continued to enter into year-to-year leases with Harold and Rosemary for the tract of land on which their cabin sat. Apparently, those leases were oral.

In early 2004, the Hurtigs decided they wanted to update their cabin and to move it above the floodplain. Duane thus handed Harold the following letter on May 11, 2004:

2

"Dear Harold and Rosemary,

"After much thought and discussion, we realize that we do not really need a lease agreement in order to build a cabin. We will just continue leasing from you on the same yearly basis.

"After our death or deaths, our children will continue leasing the cabin property from you. If, upon your death, your heirs choose to not keep the property, we would like to have the first right of refusal. If that is not an option, we would ask for fair market value of our cabin to be included with the sale of your cabin and land. We would ask that the fair market value be paid to us or our heirs from the proceeds of this sale.

"We feel that two nice cabins can only add to the value of the land if it ever becomes necessary to sell-God forbid. However, unforeseen things which we haven't anticipated sometimes happen.

"We enjoy the cabin, the woods, the wildlife and you two and will do our part and more to continue our fun and healthy relationship.

"Sincerely,

Duane and Joyce Hurtig"

Upon reading the letter, Harold told Duane that because the Waltons already had the right of first refusal, he could not agree to that term. He then told Duane that he would need to review the document and speak with Rosemary and Sharon (his wife and daughter, respectively).

Approximately two weeks later, on May 27, 2004, Harold asked Duane about the possibility of constructing the new cabin. Harold told Duane "go ahead and build the cabin." Neither party expressly referenced the May 11th letter.

The Hurtigs' plans to build a more modern cabin on the Living Trust property required approval by the Sumner County Zoning Office. In September 2004, Harold signed the building application that Duane gave to the Zoning Office. This application listed Harold as the owner and Duane as the lessee of the land on which the new cabin was to be built, and stated the estimated cost of constructing the cabin as $30,000.

3

Soon thereafter, the Zoning Office granted Harold and Duane's building permit request. The building permit listed the Living Trust as the owner of record and Duane as the "agent/occupant" of the new construction. The building permit also required someone to file a notice of completion with the Zoning Office once the cabin had been constructed. Duane filed this notice, which listed the Living Trust as the owner of record, in May 2006.

The Hurtigs designed and paid for the cabin. It had one bedroom, one bathroom, a kitchen, an additional living space, and full plumbing and electricity. To avoid flooding, the cabin was built on concrete piers so water could pass underneath it when the Ninnescah River reached flood stage. At one point, Harold participated in the construction by providing the Hurtigs with "fill dirt." Including materials and labor, the Hurtigs spent $58,162.18.

After the new cabin was constructed, the Hurtigs continued to enter into year-to-year leases with Harold and Rosemary for the land beneath the cabin. The Hurtigs paid $400 for a year's lease. Harold and Rosemary visited the Hurtigs in the new cabin frequently, just as they had done when Hurtigs had been in the primitive cabin.

In 2010, Harold died. The next year Rosemary, as the sole remaining trustee of the Living Trust, deeded the land to the Revocable Trust. From 2011 until Rosemary's death in 2014, the Hurtigs continued to enter into year-to year leases with Rosemary through her authority as the trustee of the Revocable Trust. Upon Rosemary's death, Rosemary's children, James and Sharon, became co-trustees of the Revocable Trust.

Presumably in late 2014, Duane sent a check for the 2015 lease to James. On January 13, 2015, James returned the check enclosed in a letter that stated:

4

"Duane,

"I am returning your check. I understand your wish to continue the annual agreement you had with my parents but that is not possible.

"As of January 31, 2014 any and all previous agreements regarding access to my [family's] land in Sumner County are no longer in effect. I am currently seeking legal advice as well as working with my sister to determine what if any future agreement could be deemed acceptable.

"I am granting you temporary access permission for the time necessary to finalize this process. This period shall not exceed 90 days.

"If you have questions feel free to contact me.

"James. D. Mattox"

The Hurtigs removed their personal property from the cabin but did not remove the cabin itself.

*Lawsuit filed*

In October 2015, the Hurtigs filed a petition against the Revocable Trust in the district court. The Revocable Trust later moved for summary judgment. The district court ultimately granted the Revocable Trust's summary judgment motion as to the Hurtigs' breach of contract claim but denied that motion as to the Hurtigs' equitable claims.

*Trial and ruling*

Trial to the court was held on the Hurtigs' unjust enrichment and promissory estoppel claims in January 2017. Duane, Sharon, and James each testified. The district court ultimately adopted all but one of the Hurtigs' proposed findings of facts and conclusions of law.

Regarding disputed facts, the district court found:  (1) Harold had allowed the Hurtigs to use some of his heavy construction equipment in building the cabin; (2) Harold

and Rosemary had frequently stopped by the construction site to check on the cabin's progress; (3) Rosemary had told Duane a more formal written agreement regarding a long-term lease or purchase of the cabin was not necessary; (4) James and Sharon had stopped leasing to the Hurtigs because they "simply [did] not want to deal with the intrusions created as a result of the continued use of the [cabin by] the Hurtigs"; and (5) removal of the cabin would be impractical.

The district court then made the following legal conclusions:

"The [Revocable Trust] throughout, with its principal focus being on . . . [the Hurtigs'] unjust enrichment claim, has consistently argued that the elements of a claim in equity have not been established herein. As a part of that argument, [the Revocable Trust] steadfastly has urged that [neither] Sharon Mattox nor [James] Mattox want the cabin, and hence no benefit has been conferred as required by the law on the subject. The [Revocable Trust] has missed the mark in its defense as to the relevant time frame that establishes the necessary elements herein for an unjust enrichment claim, or a promissory estoppel claim for that matter.

"The moments of legal importance herein occurred in 2004 and 2005, when Harold Mattox gave the go ahead for construction of the cabin knowing the expectations of the Hurtigs for payment per the letter if their continued use of the cabin was denied, and not only allowing, but actively participating, as the Hurtigs expended substantial sums in money and labor in improving the property owned by the [Revocable Trust]. The uncontroverted testimony of Duane Hurtig is but for the understanding set forth in the letter the cabin project would never have occurred. . . . The Court has little hesitation in finding herein that each of the [necessary] elements of unjust enrichment ha[s] been satisfied by the evidence herein, a contrary result would be wholly inequitable, and in the alternative, the elements of promissory estoppel have likewise been satisfied under the involved facts."

The district court awarded the Hurtigs $70,000 based upon Duane's valuation of the cabin's fair market value. The Revocable Trust timely appealed.

6

*Did the district court err in finding the Revocable Trust was unjustly enriched?*

The Revocable Trust contends that the district court erred in finding it was unjustly enriched. First, it argues that the Hurtigs have no remedy as a matter of law because under the common law, tenants had no remedy against landlords concerning improvements to the landlord's property absent a lease agreement or statute stating otherwise. Second, the Revocable Trust argues that the facts do not show unjust enrichment because the Mattoxes did not engage in any offensive conduct and did not receive, accept, or retain any benefit.

*Standard of review*

This court's review over the district court's finding on an unjust enrichment claim is bifurcated; we review the district court's factual findings for substantial competent evidence, and we exercise unlimited review while considering the district court's legal conclusions. See *Hodges v. Johnson*, 288 Kan. 56, 65, 199 P.3d 1251 (2009); *Haz-Mat Response, Inc. v. Certified Waste Services Ltd.*, 259 Kan. 166, 176, 910 P.2d 839 (1996). "The question of whether one party can recover damages from another based upon the theory of unjust enrichment is a question of law, with an unlimited scope of review." *T.R. Inc. of Ashland v. Brandon*, 32 Kan. App. 2d 649, 655, 87 P.3d 331 (2004).

*Unjust enrichment, generally*

Unjust enrichment has three elements:  "(1) a benefit conferred upon one person by another; (2) an appreciation or knowledge of the benefit received; and (3) the acceptance or retention of the benefit by the individual receiving the benefit under such circumstances as to make it inequitable for the individual to retain the benefit without payment of its value." *Security Benefit Life Ins. Corp. v. Fleming Companies, Inc.*, 21 Kan. App. 2d 833, Syl. ¶ 5, 908 P.2d 1315 (1995). That benefit need not be conferred by

7

nefarious means. *Nelson v. Nelson*, 288 Kan. 570, 589, 205 P.3d 715 (2009). Unjust enrichment claims may succeed in cases of unilateral mistake or mutual mistake. See *Nelson*, 288 Kan. at 589; *Gleason & Son Signs v. Rattan*, 50 Kan. App. 2d 952, 962-63, 335 P.3d 1196 (2014). These claims are often raised by persons who were under the impression that a valid contract existed. See, e.g., *Application of Radke*, 5 Kan. App. 2d 407, 414, 619 P.2d 520 (1980).

Our Supreme Court long ago recognized the following principle: "In equitable matters this court adheres to the rule that no wrong should be suffered without a remedy." *Dougan v. McGrew*, 187 Kan. 410, 413, 357 P.2d 319 (1960). Since then, our Supreme Court and this court have considered numerous unjust enrichment claims. In doing so, our Supreme Court has explained: "Unjust enrichment/quantum meruit is an equitable doctrine. Unjust enrichment is the modern designation for the older doctrine of quasi-contract. The theory of quasi-contract was raised by the law on the basis of justice and equity regardless of the assent of the parties. The substance of an action for unjust enrichment lies in a promise implied in law that one will restore to the person entitled thereto that which in equity and good conscience belongs to that person." *Haz-Mat Response*, 259 Kan. 166, Syl. ¶ 5 (finding that subcontractors who have furnished materials for an improvement may bring suit under the doctrine of unjust enrichment against parties in the original contract who have retained a benefit under inequitable circumstances).

*Is the unjust enrichment claim barred as a matter of law?*

The Revocable Trust first argues: "A tenant is not entitled to compensation for improvements left behind at the expiration of a lease unless a lease or statute provides otherwise." Both parties agree that the cabin the Hurtigs built constitutes an "improvement." Broadly speaking, "an 'improvement' to real property permanently increases the property's value or desirability. An improvement to real property usually

8

refers to buildings but may also include any permanent structure or other development of the property." 41 Am. Jur. 2d, Improvements § 1.

The Revocable Trust asks us to apply the common-law rule that tenants had no remedy against landlords concerning improvements to the landlord's property absent an agreement or statute stating otherwise (citing 49 Am. Jur. 2d, Landlord and Tenant § 752; 52A C.J.S. Landlord & Tenant § 936). Under that rule, tenants could remove any non-integral improvements made before the termination of their lease but could not remove integral improvements because that would cause injury to the landlord's property. See 52A C.J.S. Landlord & Tenant § 930. The Revocable Trust contends that because the Hurtigs had neither a contract nor a statute stating otherwise, see K.S.A. 58-2540, et. seq., the Hurtigs are not entitled to compensation for the cabin.

We believe, however, that even when no contract or statutory remedies exist, under appropriate circumstances an aggrieved person may seek the equitable remedy of unjust enrichment for improvements to another's property. Kansas courts adhere "to the rule that no wrong should be suffered without a remedy," *Dougan*, 187 Kan. at 413. Our Supreme Court has consistently considered unjust enrichment claims brought by subcontractors who have not been paid for improvements. See *Haz-Mat Response*, 259 Kan. 166, Syl. ¶ 7. And in at least one case, a panel of this court has considered an unjust enrichment claim brought by a tenant against a landlord based upon the landlord's failure to pay the tenant for improvements the tenant made to the landlord's property. *Jacobs v. Dudek*, No. 93,497, 2006 WL 213865, at *4 (Kan. App. 2006) (unpublished opinion). We find no legal impediment under Kansas law to a tenant's bringing an unjust enrichment claim against a landlord for the value of improvements made on the land.

Courts in many jurisdictions have allowed tenants to recover under the doctrine of unjust enrichment for improvements made to the landlord's property even absent a provision in the lease or a statute. See, e.g., *Grisanti v. Zanone*, 2010 Ark. App. 545, *6,

9

336 S.W.3d 886 (2009); *Kinzer v. Westgate*, 129 Idaho 621, 625, 931 P.2d 1 (Ct. App. 1997); *Schmeckpeper v. Koertje*, 222 Neb. 800, 803-04, 388 N.W.2d 51 (1986); *Chesney v. Stevens*, 435 Pa. Super. 71, 74, 644 A.2d 1240 (1994); *Whitson v. Lende*, 442 N.W.2d 267, 270 (S.D. 1989); *Realmark Developments, Inc. v. Ranson*, 214 W. Va. 161, 166, 588 S.E.2d 150 (2003); see *Gourley v. O'Donnell*, 51 Or. App. 477, 483, 626 P.2d 367 (1981).

In *Chesney,* the landlord had told the tenants that they could remain in the house as long as they paid rent. The Superior Court of Pennsylvania held the tenants had a valid claim of unjust enrichment, finding:  "[I]f a tenant, with a reasonable and good faith expectation of long-term occupancy or ownership, makes substantial and obvious improvements to the real estate of another, the tenant is entitled to compensation for the improvements when they have been accomplished with the actual or implied knowledge and consent of the owner." 435 Pa. Super. at 78.

> "Here, appellees-tenants claimed a life estate in the premises by virtue of appellant-landlord's alleged promise that they could live on the leased premises for as long as they continued to pay rent. Although the trial court concluded that appellees-tenants had not proven that they possessed a legally cognizable life estate, the court did not make a finding that such a promise had not been made by appellant-landlord. Furthermore, although appellant-landlord … asserts that he was never given notice, and was thus, unaware that improvements were being made to the realty, a review of his trial testimony reveals that he had been on the property on numerous occasions and that he conceded that he was aware of many of the improvements.
>
> "Having reviewed the record of the proceedings below, we find that the improvements made to the leased premises were patent and obvious; and that there was a nearly complete transformation of the dwelling from an old and dilapidated structure into a greatly improved home over a period exceeding three years. Thus, we conclude that appellees-tenants made substantial and obvious improvements with a reasonable and good faith expectation of long-term occupancy; and that appellant-landlord had knowledge of these improvements, and consented to them by his passive receipt of the

10

benefit conferred upon him (an improved dwelling, with a substantially increased market and rental value). In these circumstances, it would be unconscionable to allow appellant-landlord to retain this benefit without reasonably compensating appellees-tenants for the improvements they had made to the dwelling." 435 Pa. Super. at 79.

The Revocable Trust tries to distinguish *Chesney* on the basis that those tenants made improvements to the landlord's house while the Hurtigs replaced their own cabin. It also emphasizes that the tenants in *Chesney* could not have removed the improvements they had made to the landlord's house.

Nonetheless, we find *Chesney* persuasive. First, the focus of our inquiry is whether the Mattoxes benefitted from the cabin having been built on *their land*. Although the *Chesney* case involved improvements to the landlord's house, both cases involve improvements to the landlord's property, which is the key point. Second, as the district court found, the evidence establishes that the Hurtigs' cabin was not movable under any practical interpretation of that term, given the high cost of doing so, the lack of access to a road, and the need to destroy many trees in the process. Third, in determining whether to permit, as a matter of law, unjust enrichment claims brought by tenants against landlords for improvements, the relevant point is that courts in other jurisdictions have recognized such claims, and not that the facts in one case are slightly different than the facts in this case.

The Kansas cases cited by the Revocable Trust do not support the conclusion that tenants who make improvements to their landlords' property absent a provision in their lease or a statute have no remedy. *Farmer v. Golden Rule Oil Co.*, 130 Kan. 803, 287 P. 706 (1930), held the landlord was not entitled to damages from the tenant when the tenant removed improvements it made before the end of its lease. But *Farmer* never held that tenants could not recover for improvements to the landlords' property through equitable remedies, as no equitable claims were at issue in *Farmer*. And *Moore v. McPherson*, 106

11

Kan. 268, 187 P. 884 (1920) states that "equity never flies in the face of positive law, nor is it invokable to unsettle thoroughly established legal principles." 106 Kan. at 273. But *Moore* did not involve unjust enrichment or a tenant's improvements to a landlord's property, and we find no positive law or established legal principles that would bar a claim of unjust enrichment here.

The Revocable Trust cites cases from other jurisdictions in which the common law rule was cited in denying a tenant relief. *Capitol Monument Co. v. State Capitol Grounds Commission*, 251 S.W.2d 473, 475 (Ark. 1952); *Crawford v. Gulf Cities Gas Corp*., 387 So.2d 993, 995 (Fla. Dist. Ct. App. 1980); *Resnick v. City of Fort Madison*, 145 N.W.2d 11, 13-14, (Iowa 1966); *Greeman v. Smith*, 138 N.W.2d 433, 438 (N.D. 1965); and *Parsons v. Hall*, 199 S.W.2d 99, 102 (Tenn. 1947). But with the exception of the *Resnick* case, these cases did not involve any equitable claim, let alone an unjust enrichment claim. *Resnick* explicitly held that the tenant did not have a valid unjust enrichment claim, but the court based that finding on facts showing that the improvements had not been made in good faith, rather than on a broad ruling that the claim could not lie as a matter of law. 145 N.W.2d at 13. Additionally, after the opinions noted above were decided, the appellate courts of Tennessee, Florida, Arkansas, and North Dakota each addressed unjust enrichment claims by a tenant against a landlord concerning improvements without holding those claims barred as a matter of law. See *Grisanti*, 2010 Ark. App. 545*6; *Sena v. Pereira*, 179 So. 3d 433, 436-37 (Fla. Dist. Ct. App. 2015); *Tong v. Borstad*, 231 N.W.2d 795-800 (N.D. 1975); and *Jaffe v. Bolton*, 817 S.W.2d 19, 26 (Tenn. Ct. App. 1991).

None of the cases expresses any rationale for excluding equitable claims in this context, and we know of none. We are thus unpersuaded that Kansas law bars tenants from seeking relief from landlords under the doctrine of unjust enrichment when an inequitable situation has been proven.

12

*Does substantial competent evidence support the unjust enrichment claim?*

The Revocable Trust next argues that the Hurtigs' unjust enrichment claim was factually insufficient because the Mattoxes did not engage in offensive conduct such as fraud or mistake, the Mattoxes did not receive a benefit, and the Mattoxes did not accept or retain any benefit conferred by the Hurtigs. We review the evidence to determine whether substantial evidence shows the necessary elements of unjust enrichment: "(1) a benefit conferred upon one person by another; (2) an appreciation or knowledge of the benefit received; and (3) the acceptance or retention of the benefit by the individual receiving the benefit under such circumstances as to make it inequitable for the individual to retain the benefit without payment of its value." *Security Benefit Life Ins.,* 21 Kan. App. 2d 833, Syl ¶ 5.

#### *A benefit was conferred.*

The Revocable Trust asserts that because the Hurtigs built the cabin for their own use with no expectation that the Mattoxes would ever use it, no benefit was conferred on the Mattoxes. It also argues that the Hurtigs' May 11, 2004, letter shows that the Hurtigs expected to be compensated for their cabin only in the event that the Mattoxes sold the land, an event which has not happened. It then asserts that the Hurtigs' true goal was not to benefit the Mattoxes when they left the cabin behind.

The Revocable Trust cites *Lafary v. Lafary*, 522 N.E.2d 916 (Ind. Ct. App. 1988) for its proposition that "[o]ne who builds improvements on the land of another for his own benefit can have no claim for unjust enrichment." The *Lafray* court ultimately held that because the tenant acted on his own behalf, he could not have reasonably expected compensation, but it did so only after finding the tenant had not made the improvements "'in furtherance of any agreement between [the landlords].'" 522 N.E. 2d at 918. Here, however, substantial evidence shows that the Hurtigs built the cabin believing that Harold

13

and Rosemary had agreed to the terms of their May 11, 2004, letter. This important fact distinguishes the cases relied on by the Revocable Trust.

The terms of the May 11, 2004, letter show that the Hurtigs expected to be paid the fair market value of the cabin if the Mattoxes ever decided not to renew their year-to-year lease. The letter expressly asked "for fair market value of our cabin to be included with the sale of your cabin and land" if the "heirs choose to not keep the property," and "that the fair market value be paid to us or our heirs from the proceeds of the sale" as the cabin "can only add to the value of the land if it ever becomes necessary to sell-God forbid." It also stated "[a]fter our death or deaths, our children will continue leasing the cabin property from you." Thus the only condition that the Hurtigs contemplated which could possibly result in termination of the year-to-year lease agreement was sale of the land. The district court found that equity required the Revocable Trust to reimburse the Hurtigs for the amount by which their cabin increased the value of the Revocable Trust's land when it terminated the year-to-year lease even though the land had not been sold. The Revocable Trust admits that the cabin constitutes an "improvement." Here, as is usual, "an 'improvement' to real property permanently increases the property's value or desirability." 41 Am. Jur. 2d, Improvements § 1. As the letter states, the cabin would add to the value of the land— it was thus a benefit to the land.

The Revocable Trust's argument that the cabin is not a benefit ignores that it received the $70,000 cabin without giving anything in exchange for it. "'In determining the measure of damages in a claim of unjust enrichment the court focuses upon the amount of benefit which the defendant received which would be unjustly retained, and does not necessarily focus on the value of money, labor, and materials provided by the plaintiff to the defendant.' *Fairbanks North Star Borough v. Tundra Tours,* 719 P.2d 1020, 1029 n.15 (Alaska 1986)." *George v. Custer*, 862 P.2d 176, 180-81 (Alaska 1993). Nor does it depend on the amount of rent the tenants paid. We find sufficient evidence in

14

support of the district court's finding that the Hurtigs conferred a benefit on the Revocable Trust by leaving their cabin on the land.

*A benefit was accepted and retained.*

The Revocable Trust next contends that the Mattoxes never accepted or retained any benefit. The Revocable Trust asserts that because it offered to let the Hurtigs remove the cabin, it did not accept the cabin. It then asserts that because Harold and Rosemary did not use the cabin and James and Sharon have no intention of doing so, it has not accepted or retained the cabin.

We find these arguments improperly rest on a subjective, rather than an objective, view of the established facts. When Harold and Rosemary allowed the Hurtigs to build a cabin on their land and assisted them in so doing, they accepted and retained the benefit that the cabin added to their land. The evidence showed that it would have been highly impractical for the Hurtigs to have removed the cabin. James and Sharon's plans not to use the cabin are irrelevant. Just as when we construe a contract, when we view the facts giving rise to a potential unjust enrichment claim it is the outward and objective manifestations of assent, as opposed to the undisclosed and subjective intentions, that matter.

The Revocable Trust briefly asserts that if Harold and Rosemary accepted and retained the benefit of the cabin when it was constructed in 2004-2005, then the statute of limitations expired before the Hurtigs' brought their unjust enrichment claim. We find this argument to be inadequately briefed, however, because the Revocable Trust has not provided any further argument or authority. See *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 645, 294 P.3d 287 (2013) (holding a point raised incidentally in a brief is improperly briefed and therefore waived and abandoned).

15

*Inequitable circumstances exist.*

The Revocable Trust argues that the Mattoxes engaged in no "legally cognizable offensive conduct or situation," and asserts that the Hurtigs have not been wronged by the Revocable Trust because the Mattoxes' acts were legal. They contend that it is equitable for the Hurtigs to bear the loss of making improvements because they failed to negotiate a longer lease and unwisely chose to build a cabin on land they did not own. In essence, the Revocable Trust argues that the Mattoxes did no wrong under the law but the Hurtigs did, so the Revocable Trust's retention of the cabin without compensating the Hurtigs would not be inequitable.

The Revocable Trust relies on *Woodson v. Harris*, 615 So. 2d 93, 94 (Ala. Civ. App. 1992), a case which held that an unjust enrichment claim could not succeed without evidence that the tenant was induced by "fraud, duress, undue influence, or mistake." It then compares this case to *T.R. Inc. of Ashland v. Brandon*, 32 Kan. App. 2d 649, 87 P.3d 331 (2004), *In re Estate of Vangen*, 370 N.W.2d 479 (Minn. Ct. App. 1985), and *Dunn v. Bagby*, 88 N.C. 91 (1883). In each of these cases, tenants were denied compensation for improvements they had made to the landlord's property. But in *T.R. Inc.*, *Vangen*, and *Dunn*, no evidence suggested that the landlord had induced the tenant to make the improvements. See *T.R. Inc.*, 32 Kan. App. 2d at 655; *Vagan*, 379 N.W. 2d at 481; *Dunn*, 88 N.C. at 94-95. Similarly, in *Woodson*, the tenant had made the improvements on his own initiative without any apparent interaction with the landlords. 615 So. 2d at 94. Here, the facts are distinctively different.

The law is different as well—Kansas does not require a showing of "fraud, duress, undue influence, or mistake" for a valid unjust enrichment claim. See *Security Benefit Life Ins.*, 21 Kan. App. 2d 833. And a benefit need not be conferred by nefarious means. *Nelson*, 288 Kan. at 589.

16

The Revocable Trust argues that no evidence shows the Mattoxes engaged in any wrong or unjust conduct, as in *421 Willow Corp. v. Callowhill Ctr. Assocs.*, No. 1848 May Term 2001, 2003 WL 21361362, at *7 (Pa. Com. Pl. 2003). That case distinguished *Chesney* and found no evidence that the landlord did anything to render unjust the termination of the tenant's lease without payment for the improvements.

But Kansas' law of unjust enrichment does not require any unjust conduct by the defendant—only the retention of the benefit must be unjust, under the circumstances of the case. See *Security Benefit Life Ins.*, 21 Kan. App. 2d 833; *Nelson*, 288 Kan. at 589. Harold and Rosemary may not have told the Hurtigs they could lease the cabin indefinitely, but they made statements and took actions that reasonably indicated to the Hurtigs they could do so—continuously permitting their family to lease the land annually from 1948 through 2014 based only on an oral agreement.

Harold and Rosemary also made statements and took actions that reasonably indicated to the Hurtigs that they agreed to the terms of the Hurtigs' May 11, 2004, letter, but for its right of first refusal. It is undisputed that after Duane gave Harold and Rosemary that letter, the following occurred: (1) Harold immediately said he could not agree to the right of first refusal requested in Duane's latter, but would review the letter and talk to his family, apparently about the letter's other terms; (2) approximately two weeks later, Duane asked Harold about the new cabin construction and Harold told Duane to "go ahead and build the cabin"; (3) Harold signed the documents the Hurtigs needed to be approved by the Zoning Office; (4) Harold participated in the construction of the new cabin by hauling dirt; and (5) Harold and Rosemary, as friends of the Hurtigs, frequently visited the Hurtigs in the new cabin. The district court also found that Harold allowed the Hurtigs to use his heavy construction equipment while building the cabin, that Harold and Rosemary frequently stopped by the cabin construction site to check on the cabin's progress, and that Rosemary told Duane that a more formal written agreement

17

regarding a long-term lease or purchase of the cabin was not necessary. Those facts are supported by the record.

This conduct by Harold and Rosemary reasonably led the Hurtigs to believe that Harold and Rosemary had agreed to the terms of their May 11, 2004, letter, except as to its proposed right of first refusal. Under the terms of the letter, the Hurtigs and their heirs would continue to lease the cabin on a year-to-year basis indefinitely or until the land was sold, in which case they requested the fair market value of the cabin. Given the facts of this case, a reasonable person in the Hurtigs' position would have construed Harold's and Rosemary's actions as affirming the terms in that letter. Thus, we find sufficient evidence supporting the finding that Harold and Rosemary's statements and acts induced the Hurtigs' to build the cabin. When James and Sharon decided not to renew the Hurtigs' lease, the Revocable Trust's retention of the cabin, which added value to their land, without payment to the Hurtigs' became inequitable.

James and Sharon allege that their parents never intended to agree to the terms of the letter. If that is accurate, then the Hurtigs decided to build the cabin based upon a mistaken belief. Sharon testified that Harold and Rosemary probably allowed the Hurtigs to build the cabin without ever explicitly telling them they had not accepted the terms of the May 11, 2004, letter because her parents did not want to be "unfriendly" and figured that that the Hurtigs would "think this through themselves." Under such circumstances, the Hurtigs would reasonably, yet mistakenly, believe that Harold and Rosemary had agreed to the terms of the letter. Unjust enrichment claims may succeed in cases of unilateral mistake or mutual mistake. See *Nelson*, 288 Kan. at 589; *Gleason & Son Signs*, 50 Kan. App. 2d at 962; *Application of Radke*, 5 Kan. App. 2d at 414.

On the other hand, if we accept Duane's testimony that Harold and Rosemary did intend to comply with the terms of the letter, but James and Sharon have simply decided not to do so, then an inequitable situation nonetheless exists. Under this set of facts,

18

James and Sharon would have engaged in inequitable conduct by refusing to renew the Hurtigs' lease without paying them for the cabin.

We thus are not persuaded by the Revocable Trust's argument that equity does not require it to pay the Hurtigs for the cabin under the circumstances of this case. The evidence establishes either that the Hurtigs were reasonably mistaken or that James and Sharon were engaged in inequitable conduct. Under either circumstance, allowing the Revocable Trust to retain the cabin without compensation would be unjust.

*Conclusion*

We find sufficient evidence showing that the Hurtigs conferred a benefit onto Harold and Rosemary, that Harold and Rosemary had an appreciation and understanding of this benefit, and that under the circumstances of this case, it would be unjust to allow the Revocable Trust, as the successor in interest to Harold and Rosemary, to retain the cabin without paying the Hurtigs the amount by which the cabin enhanced the value of their land. Thus, under the unusual circumstances of this case, the district court's unjust enrichment ruling was correct. Because the Hurtigs' $70,000 damages award was appropriate based on the Revocable Trust's unjust enrichment, we need not consider the district court's alternative finding that the doctrine of promissory estoppel also supports that conclusion.

Affirmed.